BACHOF, (FRESE v.) See Cases Nos. 5,109 and 5,110.

BACKHAUS, (SECKEL v.) See Case No. 12,599.

## Case No. 710.
### BACKHOUSE v. JETT et al.
[1 Brock. 500.][1]
Circuit Court, D. Virginia. May Term, 1821.

SLAVERY—FRAUDULENT CONVEYANCES—RIGHTS OF CREDITORS — ISSUE AND PROFITS — EXECUTORS AND ADMINISTRATORS.

1. Where a chancery suit is depending against an administrator, and the cause has been referred by the court, to a commissioner, to ascertain the amount due by the administrator to the estate of his intestate, it is error in the commissioner to admit an administration account of the said administrator, which has been settled before another commissioner in the country, under the direction of a distinct tribunal, and while the suit in this court was pending, without the knowledge or participation of the complainant. The commissioner should require vouchers for each item in such account, and reject all items that are not established by competent testimony.

2. A father, in 1783, made a voluntary deed of gift of certain slaves to his only son, and possession followed and accompanied the deed. In 1785, the father died, having appointed his wife and another, executrix and executor of his last will. Subsequently, the son and donee qualified as administrator de bonis non upon his father's estate, and in that capacity, a judgment at law when assets was rendered against him for a considerable sum of money, the jury having found for the administrator on the plea of fully administered. Many years after the date of this judgment, the plaintiffs filed a bill in chancery against the administrator and others, assailing the deed of 1783, as fraudulent as to creditors, and claiming to have their debt discharged out of the property conveyed by that deed. Held: That the slaves conveyed by such voluntary deed, are not assets in the hands of the representative of the donor's estate, although such representative was the donee himself.

3. That though such voluntary deed is void as to creditors, whether the transaction involves moral turpitude or not, it vests in the donee a title that is good against all the world save creditors, and defeasible by them only. Though creditors have a claim upon the slaves, conveyed by such deed, for the payment of their debts, they have no title to the slaves themselves. The donee does not seem to be a mere trustee for creditors, and is not liable for the hires and profits of the slaves and their issue or for interest on the sales of such as have been sold, from the time that he received them, or that the slaves were sold, but is responsible only for the slaves themselves, and their issue, that were in being when the demand was made by the creditors, and their profits from that date, and for the money actually received for those which have been sold, and interest thereon, from the time that the demand was made; viz. from the institution of the suit.

[Cited in Merrill v. Dawson, Case No. 9,-469; Fowler v. Merrill, 11 How. (52 U. S.) 396.]

[See Collinson v. Jackson, 14 Fed. 305; In re Grant, Case No. 5,693.]

In equity. On the 10th day of June, 1783, Thomas Jett, of the county of Westmoreland, Virginia, made a deed of gift of one half of all his lands in fee simple, and twenty-one

[1] [Reported by John W. Brockenbrough, Esq.]

slaves, which are mentioned in the deed by name, and also a moiety of all his other personal property of every kind, whatsoever, to his only son, William Storke Jett, for his support and advancement in life. This deed of gift was duly recorded in the county court of Westmoreland, on the 29th day of July, of the same year. In the month of February, 1785, Thomas Jett, the father, made his will, ratifying and confirming the deed of gift to his son William, and making sundry devises, and giving sundry specific legacies to his wife Sukey Jett, and other relatives. The testator appointed his wife and another, executrix and executor of his will; and during the spring or summer of 1785, he departed this life. Some time after the death of Thomas Jett, the then representatives of John Backhouse, the intestate of the complainant, instituted an action of assumpsit against William Storke Jett, the administrator, with the will annexed of Thomas Jett, deceased. The defendant pleaded the general issue of non assumpsit and plene administravit, and the jury found for the plaintiffs on the first issue, and for the defendant on the last. At the June term of this court, 1799, judgment when assets was rendered in favour of the plaintiffs for the sum of $3,378.56. A few years after the rendition of this judgment at law, the plaintiffs filed their bill in equity, in this court, against William Storke Jett, in his own right, and as administrator de bonis non of Thomas Jett, deceased, and the other legatees of Thomas Jett, alleging, that they had in their possession property belonging to the said Thomas Jett's estate, of which the jury had no knowledge at the trial of the issue of fully administered, and praying a discovery of the amount and value of said property, which was in their hands respectively, and that it might be subjected to the payment of the debt for which their judgment, at law, was rendered. No specific claim, however, was asserted in the bill, to the property conveyed by the deed of the 10th of June, 1783, to William Storke Jett. The principal defendant, William Storke Jett, admitted in his answer, that his father, Thomas Jett, died considerably indebted to the plaintiff's intestate, but insisted that all the assets that had come to his hands to be administered, had been faithfully applied to debts of equal, or superior dignity, to that due to the estate of John Backhouse. He denied that he had, as charged in the bill, delivered the specific legacies to the respective legatees, but affirmed that the subjects of those legacies had been, several years before the date of the will, given to the legatees, who had ever since had them in possession, and that they were mentioned in the will, as legacies, by way of confirming gifts, theretofore, made by the testator to his children, and also denied that they had ever gone into the hands of Thomas Jett's representatives as assets, or ever could in truth be so considered, as the gifts, being of personalty, were complete by the delivery, and an absolute title had thereby vested in the donees. Various orders were from time to time made in the cause, and in July, 1817, the surviving plaintiff filed his amended bill, assailing the deed made by Thomas Jett to his son William Storke Jett, before recited, as fraudulent and void as to creditors, the grantor being (as was alleged) largely indebted at the time of its execution, to an amount more than sufficient to absorb the residue of his estate, as was shown by its subsequent insolvency, under the administration of the donee himself. The amended bill, also charged that several debts of Thomas Jett had been paid from the personal fund, in the hands of the administrator, in discharge of specialties, which bound the land thus fraudulently conveyed, and to the amount of such disbursements, claimed that the plaintiff should be substituted in the place of the bond creditors, and have the benefit of the charge they might have asserted against the land, &c. William Storke Jett, in his amended answer maintained, that the deed of June, 1783, was valid, inasmuch as it was made by a man universally deemed solvent at the time, and affirming that the debts referred to in the amended bill, as specialty debts, were in truth but simple contract debts, being due upon bills of exchange, which did not bind the land: but that if the court should consider the said deed as void as to creditors, still in no event could he be charged with the increase and profits of the slaves, or for the value of such of them as were dead, or for interest upon the sales, &c., no notice having been given until the amended bill was filed, after a lapse of thirty-three years from the date of the deed, that the property thereby conveyed, would be sought to be made liable for the plaintiff's claim. At the June term of this court, 1819, the court "without deciding at present upon any of the points stated in the answer," made an interlocutory order, directing any commissioner of the court, to execute a prior order made in the cause, and recommitting it to the same commissioner, with specific instructions to report further, inter alia, accounts of the values of any estates derived, by any of the defendants, under gifts from the said Thomas Jett, in his lifetime, distinguishing in such accounts the real from the personal estate so derived, &c., and report thereof, to the court. In pursuance of this order, the commissioner made his report, stating that William Storke Jett, the administrator of Thomas Jett, had, at two different times, made up his administration accounts on Thomas Jett's estate, before commissioners appointed by the county court of Westmoreland, &c., dated the 22d day of September, 1798, showing a balance due the administrator, of £200 0 11½, and the last on the 18th of May, 1818, showing a balance in his favour of £1639 15 5½, "neither of which has been surcharged and falsified, nor attempted to be; therefore, the commissioner

has (agreeably to the rule of our state courts) taken them as correct." The commissioner also reported the estimated value of the property, real and personal, conveyed by Thomas Jett to William Storke Jett, by the deed of 1783, allowing interest on the whole amount, from the 31st day of December, 1786. The estimated value of the slaves alone, with interest from that date, would more than satisfy the whole demand of the complainant. To this report various exceptions were taken, both by plaintiff and defendant, which are fully stated, and considered in the following opinion, delivered on the 6th day of June, 1821, by—

MARSHALL, Circuit Justice. In this case, the plaintiff had instituted a suit on the common law side of the court, to which the defendant pleaded the general issue, and fully administered. The first was found for the plaintiff, and the second for the defendant, and judgment was rendered for the plaintiff, to be satisfied out of the assets of his testator, when they should come to his hands to be administered. This bill is filed, alleging, that assets were in the hands of the administrator, at the time the verdict was given, which were not known to the plaintiff, and were not shown to the jury, and that assets have since come to the hands of the administrator, which are liable for this debt. The bill, also, asserts a claim on the real estate, upon the principle of marshalling assets. The accounts were referred to a commissioner, and his report has been excepted to by both parties.

The plaintiff excepts, because the commissioner has given to an ex parte report, made by the county commissioners, to the county court of Westmoreland, while this suit demanding an account, was depending in this court, the same effect as would be allowed to such report, had it been made before the institution of this suit. This exception is sustained. While a suit for an account is depending, neither of the parties ought to be permitted to change their relative situation by a proceeding, without the knowledge, or the participation of the other. The commissioner, therefore, ought to have required vouchers for this account. It is said, that the deposition of Mr. Campbell, is a sufficient voucher for the most considerable item in it. The objection made to this deposition is, that this debt was not mentioned in the account, which was taken before the commissioners in 1798, nor in the answer filed in this cause.[2]

These omissions certainly throw some doubt over the claim for this credit, and require that it should be sustained by clear testimony; but they do not conclusively negative the right to it. When an administrator supposes himself to have fully administered the assets in his hands, he may be careless about adding to the sum he has overpaid; and when a plaintiff himself comes into a court of equity, after a verdict against him, on the plea of fully administered, to show assets at that time, in the hands of the administrator, he cannot be permitted to contest the right of the administrator, to show the disbursement of those assets. I shall, however, reserve the decision on this claim, till the report shall come in.[3]

The principal controversy between the parties, respects a number of slaves, comprised in a deed of gift made in his lifetime by Thomas Jett, the original debtor, to the defendant, his son, for his establishment in life. This deed being voluntary, is said to be fraudulent as to creditors, and the plaintiff claims the slaves and their hire, from the death of the donor. The defendant contends, that he is liable only for the slaves now alive, for the price of such as have been sold, and for interest and hires, if at all, only from the filing of the bill, in which the claim is made. The commissioner has charged the administrator, with the value of all these slaves, and with interest on this sum. Several exceptions have been made to this item of the account, and the instructions of the court, for regulating the conduct of the commissioner, have been required.

The plaintiff contends—1st, That these slaves were assets in the hands of the administrator. 2d, That a person, holding under a voluntary deed, is liable for profits. If the first point be decided in favour of the plaintiff, it will determine the question, for it has never been doubted that an administrator is liable for the profits, which have been made on the assets in his hands.

Are slaves then which are given by the owner in his lifetime, assets in the hands of his representative, if required for the payments of debts? If this was a case of the first impression, it would be decided by the words of the act of our state legislature, which makes such deeds of gift void against those only who may have been injured by them. As between the parties, they are to all intents and purposes valid. William Storke Jett, so far as respected any claim to be set up by Thomas Jett, was the owner of these slaves; and if this be true, they could not be assets in the hands of the representatives of Thomas Jett. But our statute is in a great degree copied from that of England, and so far as it is copied, Virginia is supposed to have adopted, with the statute, the settled English construction of it. It is therefore proper to examine the English cases on this point.

The counsel for the plaintiff relies much on Roberts, on Frauds, (volume 2, pp. 592, 593.)[4] Roberts says, "But, wherever a man makes a fraudulent gift of his goods and chattels, and dies indebted, the rule, upon the statute

---

[2] [See note at end of case.]

[3] [See note at end of case.]
[4] Rob. Fraud. Conv. 592, 593.

of Eliz. c. 5, has always been to construe the gift as utterly void against all his creditors, and the debtor to have died in full possession, with respect to their claims, so that the effects are just as much assets in the hands of the personal representatives, as to creditors, as if no such attempt to aliene them had been made." It is admitted, that Roberts lays down the rule, in broad and explicit terms. But very little attention to what immediately follows, will be sufficient to show that his expressions are very unguarded; and that if his proposition is true in any case, it is only in the case of the donor's retaining possession. This was the point determined in Bethel v. Stanhope, Cro. Eliz. 810.

In Bethel v. Stanhope, the donor died in possession, and the defendant had intermeddled with the goods, so as to become executor in his own wrong, before administration was granted to him. After administration granted, he delivered the goods to the donee, who was the daughter of the donor. The court determined, 1st, That the defendant might be sued as executor, and 2d, That the goods which had been in his possession, were assets, and remained such, notwithstanding the delivery to the donee. In addition to the very essential fact, that the donor, in this case, died in possession of the goods, there was a clause in the deed, that it should be void upon the payment of 20s, and the jury expressly find that it was made by covin, to defraud his creditors. As covin implies participation in the actual fraud on the part of the donee, it is presumed that she could not have recovered these goods in a suit against the donor, or his administrator. He was, therefore, in possession of the goods, which he might lawfully retain, and which were assets in his hands for the payment of debts. He could no more divest himself of these assets, or of his liability for them to creditors by delivering them to a donee, not having a legal right to demand them, than by delivering them to a legatee.

Roberts adds, "To give substantial effect to this construction, the voluntary donee is considered as liable to be charged as executor de son tort, if he take possession of the goods after the decease of the donor." Now, to me it seems difficult to reconcile this determination with the idea, that these goods are assets in the hands of the rightful executor. If any other person take them from the possession of the executor, he is a trespasser, and not an executor de son tort, unless he claims to take them as executor, or does other acts of an executor. This is expressly determined in Read's Case, 3 Coke, 33, pt. 5. It seems to me, that charging the donee, in this case, as executor de son tort, when another person would not be so charged for the same act, instead of proving, that they are assets in the hands of the rightful executor, goes far to prove the contrary. Read's Case contains another principle, which is decisive on the general question, where the possession has been parted with by the donor. The court says: "When the defendant takes the goods before the rightful executor hath taken upon him or proved the will, he may be charged as executor of his own wrong, for the rightful executor shall not be charged but with the goods which come to his hands after he takes upon him the charge of the will."

Now, if the executor shall not be charged with goods of which the testator died possessed, until they are reduced to actual possession, he shall not, a fortiori, be charged with goods of which the testator did not die possessed, but which he had given away in his lifetime. But to return to Roberts. He says, that where the goods are taken by the donee, after administration granted to another, he may be charged as executor de son tort: "and this," he adds, "seems to be a rule much in favour of the rightful executor and administrator, who cannot excuse himself upon the statute of Elizabeth, from delivering up the subject of his testator's, or intestate's fraudulent gift to the donee, if he demand it." [5]

Now, this proposition appears to me to be in direct opposition to that before laid down by the same author. If, under the statute, the executor is obliged to surrender the thing given to the donee, even where the donor dies in possession, and the thing is in his hands, he is not afterwards chargeable with the same property as assets, and, a fortiori, he cannot be charged with it, if it never came to his hands, but was delivered to the donee, in the lifetime of the testator.

This last doctrine of Mr. Roberts, is completely sustained by the case in Cro. Jac. 271.[6] In that case, the donor died in possession, and the donee sued the administrator, who pleaded, that the gift was fraudulent, and that his testator was indebted, and did not leave other assets sufficient to pay his debts. The plaintiff demurred, and the court gave judgment in his favour. This case seems to me to be entirely decisive of the whole question. If the administrator could not maintain his own possession against the donee, it is very clear that he could not defeat the possession of the donee; and if he could not, it is equally clear, that the law cannot consider the goods as assets in his hands.

Mr. Stanard also quoted 1 Madd. 218, and 2 Term R. 587.[7] But Maddox goes no further than to say, that the goods "shall still be considered as a part of the donor's estate for the benefit of his creditors;" that is, as I understand him, they shall be so considered in the hands of the donee; and the case

[5] Rob. Fraud. Conv. 594.

[6] Hawes v. Leader, 3 Cro. Jac. 270, 271.

[7] Edwards v. Harben, 2 Durn. & E. [2 Term. R.] 587. Creditor took an absolute bill of sale of the goods of his debtor, but left them in debtor's possession a limited time, during which he died, and creditor took the goods and sold them. The bill of sale gave no title, as possession did not follow and accompany it, and creditor liable as executor de son tort.

in 2 Term R. only determines, that the donee may be considered as executor de son tort. I think, then, it is very clear, that, according to the English cases, as well as on the words of the statute, these slaves are no assets.

2d, This leads to the inquiry into the extent of the liability of the donee.

It is not denied that this is a case free from any charge of covin. There is no fraud in fact, or bad faith on the part of the donee. I think there was none on the part of the donor, for the case presents no reason for supposing that the deed was made in contemplation of insolvency, or with a view to defraud creditors. It is made two years before the death of the testator, and before the date of his will, and it is not pretended, that he was at the time in bad health. He does not appear to have been pressed by creditors, nor does the administration account exhibit debts of which he might be particularly apprehensive. There are no judgments, or even bonds; there is nothing to induce a suspicion, that he was not in good credit, or that he doubted his ability to pay any claim which might be brought against him. In this situation, he gives half his estate to his only son for his establishment in life. The policy of the law very properly declares this gift 'void as to creditors, but looking at the probable views of the parties at the time, there appears to be no moral turpitude in it. In such a case, is the donee responsible for more than the slaves themselves, including their issue now in existence, and their profits from the time they were claimed by creditors, and for the money actually received for those which have been sold, and for interest on that money, from the same time? Is he responsible for profits, which accrued before the creditor made his demand?

There is some difficulty in this question, considered merely on principle. The donee has title against all the world, except against creditors. He has a title defeasible by creditors only. It is good against the donor and his executors. Where a person having no title, holds the property of another, the profits belong to that other; but in this case, the slaves are not the property of the creditors. They have a claim upon them for satisfaction of their debts, but no title to them. Profits, in the hands of an executor, are liable for debts, because they form a part of the estate of the testator, and the executor receives them as trustee for that estate. But the donee is not a trustee for the estate of the testator; and it is not clear that he is a trustee for the creditors, since he has always held the property in his own right. It is by no means clear upon principle, where the title is not to the thing itself, but to have it sold in satisfaction of a debt, that this title can extend to the profits previously made of that thing, by a bona fide possessor.

It might be expected, that these questions had frequently arisen under a statute, passed in the reign of Elizabeth, and had been long settled. But I have been able to find no case in which it has arisen; and I am the more inclined to think it never has been made, because the gentlemen concerned in this cause would, I think, have found the case, had it existed. In Partridge v. Gopp, Amb. 596, a gift of money to daughters was declared void, and directed to be refunded, but no claim appears to have been made for interest. Viner, in his first volume, page 186, pl. 9, lays down the broad and general principle, that a bona fide possessor receives the profits as his own. But I should be much better satisfied could I see the case itself, and the reasoning on which the decision was made.

In the absence of decisions in cases of personal property, those which have been made respecting the profits of real estate have been resorted to on both sides, and gentlemen, reasoning from analogy, have applied the law in such cases, to voluntary gifts of chattels. It has been affirmed, and denied, that heirs, devisees, and all persons holding real estates as volunteers, are accountable to creditors for profits. The case of Davies v. Topp, 1 Brown, Ch. 524, has been relied on, as showing that the heir is accountable for profits. The report of that case, is remarkably confused and unsatisfactory. John Topp died in April 1778. The bill was brought for an account and application of the personal estate, not specially bequeathed, to the payment of debts; and in case the personal estate should not be sufficient, to have the deficiency raised by sale or mortgage of the real estate. The cause was heard at the rolls in February 1780, when it was directed, that the real estate should be sold, to make up any deficiency in the personal estate; and it was declared, that if the real estate should not be sufficient, the rents and profits should be applied to make up the deficiency. There are several parts of this decree, as stated, which appear to me to be very extraordinary; but I shall not notice them, because they do not apply to the question before the court, though they certainly bring the whole case into some doubt. But the decree, so far as it respects rents and profits, is expressed in general terms, not declaring, whether the rents and profits shall be computed from the death of the testator, or from the filing of the bill. In the particular case, it could not have been of much consequence, for the cause was heard at the rolls, in less than two years after the death of the testator, which leaves it probable, that no profits accrued between the death of the testator, and the filing of the bill. It does not appear, certainly, from the opinion of the chancellor, whether this case was affirmed or reversed, and in his opinion, not a syllable is said on that part of it which respects profits. The principal question, that on which the parties were desirous of obtaining the opinion of the court, appears to have

been, whether, after purchased lands which descended to the heir, or specific legacies and lands, specifically devised, but charged with debts and legacies, should be first liable for those debts. The complexion of the case, gives some reason for the opinion, that the question of profits was, in fact, of no importance, and was not raised in the bill. This case, I think, leaves that question where it was found.

The cases in 2 Atk. are so obscurely reported, as to give no decisive information on the subject. In Sims v. Urry, 2 Ch. Cas. 225, the chancellor decreed profits only, from the time of pronouncing the decree.

Baron Weston's Case, as cited in 1 Vern. 174, was this: Baron Weston brought debt on a bond against the heir, but for three descents the heir continued an infant, so that the parol demurred. The guardian received the profits of the estate, and converted them to her own use. The baron brought an action against her, as administratrix of the children, but did not succeed. In the principal case, the counsel admitted that profits could not be demanded during minority.

In Waters v. Ebrall, 2 Vern. 606, it was determined, that a guardian was not compellable to apply the profits of a ward's estate, to the payment of bond debts.

In the case of Chambers v. Harvest, Mos. 124, the question was, whether the heir should account for profits from the time of filing the bill?

In 6 Ves. 93, (Pulteney v. Warren,) the chancellor says; "Where there has been an adverse possession, and upon an application to this court, upon grounds of equitable relief, the plaintiff appears entitled to an account of rents and profits, if there has been a mere adverse possession, without fraud or concealment, or an adverse possession of some instrument, without which the plaintiff could not proceed; the court has said, the account shall be taken only from the filing of the bill, for it is his own fault not to file it sooner."

In 7 Ves. 541, (Pettiward v. Prescott,) the amount of rents and profits was restrained to the time of filing the bill. These two cases from Vesey, are not cases where the heir is made liable for the debt of the ancestor. They are cases of title, which is much stronger. Even in them, the account has been restrained, where there was nothing to prevent the plaintiff from having proceeded, to the time of filing the bill.

In the case of Shetelworth v. Neville, 1 Term R. 454, which was an action of debt against the heir, Ashhurst says: "Till the possession is recovered against him, (the heir,) he is entitled to the rents and profits; and he is entitled to receive them till judgment is given against him." Id. 457.

At common law, the heir who had aliened before action brought, might plead, that he had nothing by descent at the time of suing out the writ or filing the bill. Had the

profits been assets, this plea could not have been maintained. The profits, therefore, were not assets. The statute of the 3d and 4th of William & Mary, which has rendered the heir, in cases of alienation, liable for the value of the land, does not make him liable for the profits, or for interest on the money. It is to be fairly presumed, that the statute has adopted the rule of the court of chancery.

Upon the best consideration I can give to the cases, I am well satisfied, that chancery does not make an heir responsible for profits accrued before the filing of the bill, and I think the analogy between real and personal estate, in this respect, is a strong one. This question was well considered in Munford's Case, and decided against the claim to profits. I regret that the opinion then given, has been mislaid. Chief Justice's note at the end of the case of Mutter's Ex'rs v. Munford, [Alston v. Munford, Case No. 267.] The plaintiff's counsel has relied on a case reported in 5 Munf. 492, (Baird v. Bland.) In the construction of a state statute, the courts of the Union have uniformly adopted the rule of decision, given by the state courts. If, therefore, the court of appeals had decided, that under our statute of frauds, a donee was responsible for profits, I should have followed the precedent, however erroneous I might have thought it. But the case to which the plaintiff has referred, is not a case under the statute. It is not the case of a creditor, but of a person having title to the slave recovered.

I think the defendant, William Storke Jett, is responsible for the slaves now alive, at their present value, or for the slaves themselves; and for profits from the filing of the amended bill which claims them; and for the money actually received for those which have been sold, with interest thereon, from the same time. And the report is to be made up in conformity with this opinion.

Decree.—In conformity with the above opinion, an interlocutory decree was rendered, allowing the exceptions of both parties, and recommitting the report to the commissioner, with instructions, not to admit any account taken before commissioners in the country, subsequent to the institution of this suit, further than the same shall be supported by vouchers or evidence. And the court doth further direct the commissioner to charge the defendant, William Storke Jett, with the present value of such of the slaves contained in the deed, of the 10th of June, 1783, in the amended bill mentioned, and with their issue, as are now in possession of the said defendant William Storke Jett, and with the profits thereon, from the 7th day of July, 1817, when the amended bill in this cause was filed, and also with the price of the slaves contained in the said deed, or of their issue, who may have been sold, or with the value of those otherwise disposed of, at

the time when disposed of, together with interest on such price or value, to be calculated from the said 7th day of July, 1817.

NOTE, [from original report.] The question of the liability of a fraudulent donee of personalty, for hires and profits, was considered by the court of appeals, in the late case of Blow v. Maynard, 2 Leigh, 29. The court determined that the donee was responsible for the hires and profits, but a very slight examination of that case will, it is believed, lead to the conviction, that the above opinion of the chief justice, so far from being impugned, is strengthened by the opinion of the judges delivered in Blow v. Maynard. The points of dissimilitude between the two cases, are very striking. In Blow v. Maynard there was evidence that convinced, at least one of the court, that the bill of sale of the personalty (slaves) was antedated, which is in itself a very cogent circumstance, to show the fraudulent intent with which it was executed. The nominal purchaser is treated by the court as a donee. because, although the instrument conveying them, purported to be a bill of sale, there was no title of evidence to show, that any valuable consideration had ever passed. It was executed by a party greatly embarrassed at the time, to a maiden aunt of the debtor's wife, who was a member of his family, and the pretended sale was not accompanied with any change of possession, and the debtor continued in possession of them, up to the period of his death, which occurred four years afterwards. The case was very much like that of Edwards v. Harben, reported in 2 Term R., cited ante, except that it was a much stronger one against the pretended vendee, and the decision of the court accorded with the determination of the court in Edwards v. Harben, viz; that the bill of sale was fraudulent, and void as to creditors, and that the nominal vendee was accountable for the slaves thereby conveyed, and their increase. hires, and profits, accruing since the death of the vendor, (the slaves having then passed into her possession, and never having been under the control, or in the possession, of the administrator,) as executrix in her own wrong, in like manner as a rightful executor would be accountable.

The question of the liability of the heir, for the rents and profits of the real estate, descended to him, was also involved, and was elaborately discussed by the judges. Two judges, in a court consisting of three, decided, that the heir was not accountable for the rents and profits, but from the date of the decree; and Carr, J., while he expressed some doubt of its correctness, seemed to acquiesce in the decision.

The deposition of Campbell, respected a debt due of £450, due from Thomas Jett, in his lifetime, to the estate of the deponent's father, which debt had been paid by William Storke Jett, executor of Thomas Jett, in 1788. This debt was omitted in the administration account of William Storke Jett, settled before the commissioners in 1798, but the executor was credited with it in the settlement made in 1818, before the commissioners of the county court of Westmoreland, during the pendency of this suit.

It has always been the practice in Virginia, for the county courts, at the instance of an executor, or administrator, or any party interested in his accounts, to make an ex-parte order for the settlement of the administration account before commissioners, without any summons to the parties concerned. Taylor, Ch., in Mountjoy v. Lowry, 4 Hen. & M. 428. And this account, when so settled, without notice, is taken as prima facie evidence of the correctness of the charges and credits, therein contained; but any party interested, may, by bill in equity, surcharge and falsify it, if capable of adducing satisfactory evidence for that purpose. Tucker, J., in Anderson v. Fox, 2 Hen. & M. 260; At-

well's Adm'r v. Milton, 4 Hen. & M. 253; Wall's Ex'rs v. Gressom, 4 Munf. 110. Upon a bill to surcharge and falsify an account of an executor, settled by commissioners, under an order of the court before which the will was proved, if the answer discloses nothing improper in the account, and the complainant exhibit no evidence to sustain his allegations, it is not incumbent on the court of chancery, to refer the account to a commissioner, but the bill should be dismissed. Wyllie v. Venable's Ex'r, Id. 369. But while the plaintiff must specify the items of surcharge and falsification, it is competent for him to show error upon the face of the account. Garrett v. Carr, 3 Leigh, 407; Lee v. Stuart, 2 Leigh, 76. And, although, under circumstances, an executor ought not to be charged with interest on balances in his hands, yet, in general, he is so chargeable; and where in an ex-parte settlement of an executor's account, the commissioners omit to charge interest, without assigning any good reason therefor, such omission may be corrected, upon a bill brought to surcharge and falsify. Burwell's Ex'r v. Anderson, 3 Leigh, 348. The presence of a legatee, during the progress of the ex-parte settlement, and his failure to state any objections, when desired to do so, (the legatee not being present when the accounts were closed, and the results stated,) will not preclude him from bringing his bill to surcharge and falsify. Garrett v. Carr, supra. And where, on a bill to surcharge and falsify, if an order be made for a new settlement, and the vouchers cannot be still produced, they will be presumed to have existed, especially, after a great lapse of time: the onus probandi is thrown upon the contesting party. M'Call v. Peachy's Adm'r, 3 Munf. 295, 301, 305; Tabb v. Boyd, 4 Call, 453. The above is a condensed summary of the decisions of the court of appeals on this subject. which are collected by Mr. Robinson, 2 Rob. Pr. 113-115. The question, whether the settlement of an administration account, made ex-parte, under the order of another court, pending a suit against the executor, before a distinct tribunal, will be taken as prima facie evidence by the latter court, has never yet, it is believed, been decided by a court of last resort. The editor, however, is informed by Judge P. P. Barbour, [circuit justice,] that the invariable practice of the court of chancery at Fredericksburg, while he practised there, was not to regard the account settled pendente lite; and to require vouchers for each item.