KIDDER M. MOORE AND J. C. MONTFORD, EXECUTORS, APPEL-LANTS, v. DANIEL HAMILTON, GUARDIAN, APPELLEE.

Executors have no authority to invest money belonging to the estate of their testators on personal security. If they do so, it is at their hazard, and on their own responsibility. They are personally liable, if the security proves defective.

The statute of this State requires executors, administrators and guardians to take mortgage security for the money of minors invested by them, and this power must be exercised under the direction, and with the sanction and approval, of the Court of Probate.

When the accounts of executors or administrators are finally adjusted and closed, it is their duty to pay over to the guardian of the minors their distributive share, and not loan it out, (if in money,) even on mortgage security.

Bank bills are treated as money, and it is not to be presumed that the Legislature in using the word *money*, meant only gold and silver. It was not intended that executors and administrators should treat such bills as other personal property, and *sell them at public outcry.*

Where executors or administrators treat bank bills, left by a deceased person, as money, if they invest in a mode not in accordance with the directions of the law, even though they act in good faith, and with an honest purpose of benefiting the estate, they are responsible for any loss that may ensue from the exercise of such discretion in a manner not warranted by the law.

On the 23d day of January, 1849, the account of Kidder M. Moore and John C. Montford, executors of the last will and testament of William Turner, deceased, filed as to the Spring Term of the Court of Probates of the County of Leon, was examined by James E. Broome, Judge of Probate of said County. Daniel Hamilton, guardian of the infant children of the deceased, who are distributees under the will, by Thomas Randall, his attorney, having notified the Court that he objected to the allowance of an item claimed by said executors as a credit, amounting to $1,612

50, a sum due and owing from William P. Craig and Edward Lockerman, who, it was alleged, were insolvent ; and the Court having, on the testimony of Richard Hayward, considered that, at the time of the loan of said sum to Craig & Lockerman, the executors had acted in good faith and with prudence, and to all appearance, for the best interest of the estate of Turner, allowed the said executors a credit for the amount claimed as insolvent. To this allowance, Hamilton, guardian as aforesaid, excepted, on the ground that the loan made was contrary to law, and prayed an appeal to the Circuit Court of the County of Leon, which was granted.

The testimony of Richard Hayward, which was taken before the Probate Judge, was as follows: That he came to the Territory of Florida in company with Edward Lockerman, in 1828—that he knew said Lockerman in Maryland. He was, at that time, considered unembarrassed, and possessed ample means to carry on his business—that he did, apparently, a prosperous business up to the year 1840, or 1841. That deponent was well acquainted with the business of said Lockerman, and in the month of March, 1841, would have considered him (the said Lockerman) as good as any man in the Territory, and would have taken the endorsement of said Lockerman with as much confidence as he would have taken that of any other man of his acquaintance here. Deponent believes, in March, 1841, that the said Edward Lockerman was worth fifty thousand dollars over and above his liabilities. Deponent knew William P. Craig in the year 1841—supposed him to be good for his contracts. He held a large property—had lost largely in St. Joseph's speculations, but deponent supposed him solvent, and would, at that time, have loaned said Craig, without security, sixteen hundred dollars of the bills of the Union Bank of Florida, to be returned in good funds.

The Circuit Court of the County of Leon, Hon. THOMAS

BALTZELL, Judge of the Middle Circuit, presiding, at the Fall Term of said Court, A. D., 1850, set aside and reversed the decision of the Judge of Probate, and remanded the cause, with directions to disallow the said item, and from this judgment, Moore and Montford appealed to this Court.

The consideration of the note given by Craig & Lockerman, for the $1,612 50 loaned by the executors, was Union Bank bills of that amount, which were admitted to be 25 per cent. below par funds at the time of the loan, and the note was made payable to K. M. Moore, *one of the executors* of William Turner.

The appellants, by their counsel, assign the following errors apparent of record in this cause :

First. The item of sixteen hundred and twelve fifty one-hundredth dollars, in the account rendered by the appellants, as executors in the Court of Probate, ought not to have been disallowed by the Circuit Court, as a credit in favor of the executors, who are appellants.

Second. The proceedings are irregular, in not exhibiting to the Court the names of any persons entitled to any interest in the subject matter in controversy.

Judge BAKER, of the Middle Circuit, sat in the place of Justice THOMPSON, who had been of counsel in the Circuit Court.

*Archer*, for Appellants, contended—

That the Judge of the Circuit Court erred in deciding that the law, 207, Thompson's Digest, applied to this case. That law requires loans by executors to be made under the direction of the Court, secured by mortgage. This was not, strictly speaking, a loan, but a *sale* of personal property, which the executors are authorized to dispose of. See Thompson's Digest, 202. Union Bank paper was perishable property—which paper, at the time of the alleged loan, was depreciated 20 or 25 per cent. The executors made

JANUARY TERM, 1851. 115

Moore and Montford, Executors, vs. Hamilton.—Argument of Counsel.

the best disposition of it, by selling it to those who are proved to have been good, solvent men at the time ; and an executor can only be required to manage the estate as the testator himself would have done. Union Bank notes were not money, but *choses* in action.

As to the second error assigned, the infant children have no legal title to any portion of the estate, and can have none, until the estate is closed and finally settled up. Citing argument of counsel in Moseley v. Williams, 2d Florida Reports.

*Branch,* for Appellee, cited—

Thompson's Digest, 207, to show the law prescribing the duty of executors, administrators and guardians, in cases like the one before the Court. The executors in this case should be held to the consequences of their failure to do their duty according to law. If they should be so held, then they were not entitled to the credit which they were allowed by the Judge of Probate, and the Judge of the Circuit Court did not err in reversing the decision, and directing the item claimed to be disallowed, for the reason that the loan was made contrary to law.

Executors are responsible for money loaned on personal security. See 2d Williams on Executors, 1547. If they loan on personal security, it is at their risk. 9th Law Library, 122.

In this case, it appears from the account filed in the office of the Probate Judge, that these executors claimed and charged commissions on Union Bank money. They sold real estate in 1841, for Union Bank paper, and thus recognized it as money. Besides, in 1840, the paper of this Bank was current as money in the country, though it did not pay specie, having suspended in 1837. But if these executors had regarded the paper of this Bank as perishable property, as is contended for by the counsel for appellants, why did they not put it in their schedule as such? Their account,

stated by the Court from accounts and vouchers in the office of the Judge of Probate, filed in 1844, shows not only that they did not so regard it, but that they actually were allowed, and got the benefit of the depreciation of the Union Bank notes.

SEMMES, *Justice,* delivered the opinion of the Court.

This case comes before the Court on an appeal from Leon Circuit Court, and the principal facts presented by the record are these : On the 30th of March, 1841, Moore, one of the executors of William Turner, deceased, having in his hands the sum of $1,612 50 in bills of the Union Bank, belonging to the estate of his testator, loaned the same to Craig & Lockerman, who executed and delivered to him their note, in the following words :

$1,612 50.   On the first day of January next, we, or either of us, promise to pay to K. R. Moore, one of the executors of William Turner, deceased, sixteen hundred and twelve fifty one-hundredth dollars, for value received.

W. P. CRAIG,
EDWARD LOCKERMAN, *Sec'y.*

The drawers of this note becoming insolvent, it remained uncollected in the hands of the executors.   Afterwards, on the 25th of October, 1849, an account of the executors with the estate, bearing date in April, 1844, was filed in the office of Probate for Leon County, and in this account appears this item of $1,612 50, reported as insolvent.   To this account, is annexed a statement of the Judge of Probate, that the account as stated is on the supposition that the $1,612 50, received at the death of the testator, was in Union Bank notes, &c.   On the same day, the attorney for respondent filed in the Probate office the following exception : "Daniel Hamilton, guardian of the infant children, who are distributees under the will of William Turner, deceased, by Thomas Randall, his attorney, appears in Court,

and makes exception to the decision of his Honor, the Judge of Probate, by which the executors are allowed a credit for $1,612 50, the amount of the loan made to Craig and Lockerman, on their returning the note and judgment thereon as being insolvent, on the ground that said loan was made contrary to law, and prays an appeal."

By evidence taken before the Judge of Probate, it appears that, at the time the loan was made to Craig & Lockerman, they were wealthy and amply able, as was supposed, to respond to their liabilities; and it further appears by the record, that the bills of the Union Bank, at or about the date of the note, were depreciated to the extent of twenty-five per cent.

The allowance of the credit of $1,612 50 constitutes the subject matter of the present controversy; and the question presented to the consideration of the Court is, as to the authority of the executors to dispose of the bills of the Union Bank in the manner they did.

The authority of executors to invest money belonging to the estate of their testators on personal security, has been the subject of frequent adjudications in the English Courts. In some of the earlier decisions, a discretion to some extent, when exercised in good faith and with due caution, seems to have been conceded to executors in this respect; but the more recent cases make no such concession, and the doctrine may now be considered as settled in England that an executor cannot invest on *personal* security; if he does, it is on his own responsibility, and at his own hazard. Precedents in Chancery, 272. Wilkes v. Steward, Cooper's Equity Reports, 6.

In the case of Terry v. Terry, Chancery Precedents, 273, the Court say, that the rule is now well established, that an executor or administrator, lending money of the deceased on bond, or promissory note, or other *personal* security, though not guilty of a legal *devastavit*, yet is guilty of a

breach of trust in equity, and is personally liable, if the se-curity proves defective.

It is true, that, where an executor exercises reasonable care and diligence in the strict line of his duty, he will not be liable for any deficiency of the money in his hands, or for the insolvency of any person who may be intrusted with it; yet, if he travel out of that line of duty, and assumes to in-vest any part of the property of the estate in funds, or upon securities not authorized by law, and a loss ensue by insol-vency or otherwise, he will be liable, however unexpected the result, or however free his conduct may have been from improper motive. See Clough v. Bond, 3 Mylne & Cr., 496.

If an executor, without good reason, leave money due upon personal security, which, though good at the time, af-terwards fails, he will be responsible. 5th Vesey, 1839. 1st Maddock, 290. And the case is much stronger, where he makes the investment improperly, as upon personal se-curity. 2d Williams on Executors, 1547. See, also, 7th Blackford's Reports, 529. 2d Wheaton's Reports, 32.

In a case reported in 2d Cox's Chan. Cases, 1, Lord Kenyon held that a trustee could not lend an infant's money on pri-vate security; if he did, he would become responsible, if the obligors became insolvent, though they were in very ample circumstances at the time of the loan; that the rule was a wise and excellent one, and should be adhered to.

Independent of the authorities referred to, the provisions of our statute seem comprehensive enough to determine the question before us. "Executors, administrators and guar-dians may, by leave of the Court, retain in their possession the money of any minor, paying for the same lawful inter-est, or shall, under the direction of the Court, put out the money of the minors at interest, upon such *mortgage secu-rity as the Court shall allow*, and if such security be taken *bona fide*, and shall prove insufficient, it shall be the loss of the minor, &c." Thompson, 207. It will be observed that

the statute not only restricts the power of executors to *mortgage* security, but as a further protection of the interest of minors, very properly annexes to the exercise of that power, the sanction and approval of the Court of Probate.

To avoid the operation of this statute, it is contended by counsel for appellant, that these infant children, who are distributees under the will of Turner, have no *legal* title to this money, or any portion of the estate, and can have none, until the account of the executors is closed, and the estate finally settled up. This doubtless is true, and yet they have such an interest in this fund and the other property, as would authorize the Courts to interpose their power, and protect the estate from waste and mismanagement. Our statute recognizes this interest as a direct and personal one, by empowering the Court of Probate, upon their application, through their guardian, and proof of mismanagement on the part of the executors, to require of the latter bond and security for the due administration of the estate. Thompson, 210. Besides, the effect of the argument is to render the provision of the statute, as to executors and administrators, wholly unmeaning and inoperative; for upon their accounts with the estate being finally adjusted and closed, it is their duty to pay over to the guardian of the minors their distributive share, and not loan it out, (if in money,) even on mortgage security.

It is also insisted that these bank bills are not money, and are, therefore, not within this statute. That they are not *money* strictly speaking is conceded, and the same may be said of the bills of all other banks; and when depreciated, they lose, to a certain extent, even their representative character. Less their depreciation, like other bank notes, they are, in conformity with common usage and common understanding, regarded as money.

In the case reported in 12th Johnson's Reports, 220, the Court say, that bank bills are treated *civiliter* as money, and a tender is good, unless specially objected to.

The Legislature, in the use of the word *money* in this statute, doubtless intended to give to it its general signification ; for it can hardly be supposed that it was contemplated to restrict the word to gold and silver, and require executors to loan that on mortgage security, while bank bills should be regarded and sold at public outcry, as other *personal* property.

But independent of these considerations, the defence set up by these executors is far from being a meritorious one; for in all their dealings with the estate, they have regarded the bills of the Union Bank as money. If they considered them as the other personalty belonging to the estate, why put them in their schedule as *money ?* Why retain the bills of this bank in their hands, for the avowed object of paying the debts of the testator, and for which purpose it is not pretended they were not available ? Besides this, by reference to their account, we find that in 1841, they sold the *real estate* of the testator for bills of this bank, amounting to the sum of $1,695, and charged commissions on this amount with interest, less the depreciation, at the rate of six per cent. As to the sum now in controversy, we find in their account this charge—" To commissions on *cash* on hand at the death of the testator—say $1,623 50, at 6 per cent— $97 41."

It further appears that, after being allowed by the Probate Court the sum of $553, for depreciation on the proceeds of their own sale of the real estate, they retain $750 in these bills to pay out as money, for and on account of the estate.

These facts sufficiently indicate their own opinion as to the character of these bills. The Court is not disposed to give them a different character, and one, in its opinion, not contemplated by the statute. The Court is of opinion that bank bills left by a deceased person, and coming into the hands of an administrator or executor, should be regarded as *money,* under the provisions of our statute ; and that the executors in this case, having failed to invest this money in

the mode prescribed by law, the estate should not suffer on account of the misapplication of this fund.

In loaning this money, these executors no doubt acted in good faith, and with an honest purpose of benefiting the estate ; but in discharging the trust committed to them, they have assumed to exercise a discretion which the law does not warrant, and it is out of the power of this Court to shield them from its consequences.

The Court can discover no reason in this case for relaxing the rule, as laid down in the authorities; but, on the contrary, many considerations of a public nature might be invoked, why the English rule, strict as it is, should be rigidly adhered to, and especially where the interest of minors is affected.

Let the judgment of the Circuit Court be affirmed.