Mn. Justice Westcott
delivered the opinion of the court.
Both parties appealed from the decree in this cause. It is a suit in chancery by Marion H. Sanderson, representing herself and Mary A. S. Sanderson, an infant, as distributees of the estate of John P. Sanderson, the deceased intestate, against the defendants, I/Engle and Hartridge, his administrators. She sues in her own right, and as guardian of her infant daughter, Mary A. *S. Sanderson. The bill was filed in February, A. D. 1876, in the Circuit Court of the State of Florida, for the Fourth Judicial Circuit, in Duval county. Plaintiff, in her bill, alleges substantially, that John P. Sanderson was the husband of Marion H. Sanderson, and the father of Mary A. S. Sanderson, and that he died intestate on the 29th June, A. D. 1871, le'aving them his only heirs surviving; that defendants, on the 7th November, A. D. 1871, were appointed administrators, and that they qualified and entered upon their duties about that time; that the personal property and assets of the estate were appraised at- a sum exceeding $50,000, a largó portion consisting in money, afid that nearly the whole amount went into the control and possessión of the defendant, I/Engle; that defendants have not made and effected in the “probate office” of 'the county any annual settlements of their accounts; but that the defendant, I/Engle, has made out, and left in the custody of the Judge of Probate, four papers purporting to be accounts current between the estate and the administrators, for the four years ending May"31, A. D. 1872, .May .31, A. D. 1373, May 31, A. D. 1874, and May the 31st, A. D. 1875; and that said papers are not signed by Theodore Hartridge, nor have they been approved and allowed by the Judge of Probate; that said defendants have not faithfully discharged their trust.
That the said I/Engle has paid claims against the estate which were not legal or just demands when paid; that I/Engle, without leave of the Probate Judge, has loaned a large portion of the money of the estate, some of which has been secured by mortgage and some loaned without security; that the defendant I/Engle 'has, moreover, /retained in his hands large sums of money belonging to the said estate for his personal use, which should have been invested and secured, and that he has collected large sums of money *213 and other assets, which do not appear in the appraisement; that Sanderson was an officer of the Florida Central Fail-road Company, and the Jacksonville, Pensacola and Mobile Kailroad Company, and said companies were, at the time of his death, largely indebted to him for personal services.
That Milton S. Littlefield, President of the J. P. & M. R. R. Co., was also indebted to him for stock in said railroad company, and that since said Sanderson’s death, said L’Engle, on account of moneys due his interstate as aforesaid, received the large sum of $40,000, for which he has failed to account.
That Sanderson was a practicing attorney, and for two years prior to his death was associated with the defendant, L’Engle, in the practice of law; that at the time of his death there was due said Sanderson, by said railroad companies, and their officers, and by others for professional services Tendered by him alone, and as a member of said firm of Sanderson & L’Engle, various large sums of money; that the defendant, L’Engle, has in his possession the books of his intestate, and of said law firm, and the complainants have no means of knowing what is due the estate, nor what lias been received or collected on account of such professional services, except by a discovery from the defendants.
That the defendants have failed and neglected in other respects to discharge their trust as such administrators; that the debts of the estate were small, and that Sanderson left ready money enough to pay them all; -that the estate might have been long since closed but that L’Engle, with' the acquiescence of Hartridge, has imprudently delayed the settlement of the estate, and appropriated the moneys belonging to the estate to uses not authorized by law; that the defendants have paid sundry claims against said estate which are not legally chargeable thereto; that said estate, or the greater part thereof, will be lost; that certain «personal property which should have been sold and converted into money has been retained, some of which has lessened in value and some has been used by L’Engle himself, while other property has been sold which should have been retained in kind; that the complainant has been kept in ignorance of the condition of the estate, and without means of support for herself and child; that the estate should have been distributed, but has not been; that the defendants have given separate bonds, which are defective and insufficient; that the papers filed in the probate office, purporting to be annual returns, are not sworn -to or verified in any way, nor signed by defendant, Hartridge; that the entire amount of debts paid by said L’Engle, as appears by said returns, up to the filing of the bill, is $14,392.99, some of the items of which are not properly charges against said estate; that if the moneys of the estate had been invested promptly the interest at 8 per cent, with annual rests would have paid the expenditures to date; that money has loaned in the city of Jacksonville at rates from 12 to 18 per cent, per annum, and that the defendant, L’Engle, should have invested the funds of the estate of Sanderson at these rates, and should be made to„ account at the highest rates of interest which could be obtained in the market; that the defendant, L’Engle, excuses himself for not turning over the funds of the estate to th'e complainant by saying that she is not a person of business habits' or knowledge, which is not the fact; that the notes and mortgages to secure the loans made by L’Engle have been máde payable to L’Engle and Hartridge, administrators of the estate of John P. Sanderson.
The hill prays an accurate and itemized account from each of the'defendants, a reference to a master to take testimony and report, the appointment of a receiver to take charge of the estate, and for an injunction and for distribution of the assets to the widow and child; that the defendants, having been made to account fully, and pay over the amount found to be due by them severally as such administrators, be discharged from the further administration of said estate, and for general relief. The bill is signed by counsel but not sworn to.
To this bill the defendants, Edward M. L’Engle and Theodore Hartridge, answered severally.
L’Engle’s answer was filed on the 5th day of June, 1876. It admits the relation of administrator and the alleged relation of the parties to the deceased intestate, denying, however, that Marion ,H. Sanderson is the general guardian of Mary A. S. Sanderson. He denies all charge of fraud, improvidence or failure to comply with the obligations of his trust and the requirements of law in the administration of said estate, or that he has used, or appropriated to his own purposes, any of the moneys or other assets of said estate.
He avers that he has received or collected no money or other property not included in the appraisement or in his returns as administrator; that he has received nothing on account of professional services due said John P. Sanderson, but has made some collections for Sanderson & L’Engle— not enough, however, to make up the deficiency-.due him as a member of said firm; that the examination of the accounts of said firm will involve much time and labor, and that he, the defendant, L’Engle, has been severely sick, and is still too sick to undertake this labor, but will do so as soon as his health permits.
He admits that he alone is responsible for the personal assets, and avers that they have b£en discreetly, properly and legally administered; that he has accounted for all the funds or other assets which have come into his hands; that he has been, and is ready at any time, to give an account of his dealings with said estate; that the moneys in his hands have been and are discreetly and safely invested; that his bond is good and himself responsible, and the estate has suffered and will suffer no diminution or loss at his hands; that there is no guardian of the infant complainant authorized by law to receive her distributive share of the assets of said estate; that he has distributed in part to Mrs. Sanderson, and has been at all times ready to furnish her with such moneys as she needed, and to give her all proper information in regard to the affairs -of said estate under his control and management; that the estate has been and is in litigation, and has never been, and is not at the date of filing said answer, in. a condition to be closed; that he earnestly -desires to wind up the estate, distribute what is left after paying the debts bewteen the complainant and her daughter so soon as a guardian, duly appointed and authorized to receive the distributive share of the latter, is appointed, and to be discharged. He denies the charges of fraud, illegality or improvidence in the administration.
The answer of defendant, Hartridge, was filed June 19th, 1876. He answers that he has had nothing to do with the personal assets, and that he has had charge of the real estate.
He denies at length and in detail all charges of fraud and maladministration, and affirms that plaintiff, Marion H. Sanderson, is not the general guardian of her daughter Minnie, but that she was appointed guardian with a power restricted to receiving and receipting for her daughter’s interest in certain life insurance moneys due the estate of J. P. Sanderson.
It has not been deemed necessary to insert in this state* ment of the.case the allegations of any of the pleadings at full length, and as written. These allegations are material only as they relate to or affect the questions raised and discussed by the parties to the appeals.
To the extent that any specific allegation becomes material in the discussion of the questions arising upon the appeal, it will be stated in the treatment of these questions as they arise.
*214 There were exceptions to each of the answers, but they were withdrawn and replication was filed on the 7th February, A. -D. 1877.
We will not discuss the questions involved in this case in the order 'in which they are stated in the petition of appeal, We will first examine the bill as to parties. We will then ex’amine the question of jurisdiction. After this we will consider the other grounds of appeal.
As to parties. We find at the threshold of our investigation a radical defect in this respect, which should be noticed in the appellate court. (2 Munf., 148; 9 Grat., 275; 3 Munf., 29.) Mrs. Sanderson, even though it be admitted that she is the general guardian of her infant daughter, and the record discloses that she is not, cannot maintain this suit in her behalf as guardian. Under our statute, (Thompson's Dig., 326, sec. 5,) as well as under the general rules of chancery practice, “infants may sue by their next friend jn all cases whatsoever.” Under our statute the next friend is required to file a bond. Where a suit in chancery is brought by a general guardian, no service being had upon the infant, the infant is not bound by the proceeding. The Supreme Court of Virginia, in speaking of such a case,, says: “Whilst there is nothing in the scope of the authority of the guardian which empowers him to sue in his own name in such a case, much inconvenience would flow from such proceeding.” (6 Grat., 301.) In that case the bill was dismissed without prejudice to a new suit in the names of the infants by their next friend. Chancellor Walworth, in the case of Bradley vs. Amidon (10 Paige, 239,) speaking of the authority of the general guardian of the estate of an infant appointed by the surrogate, says: “Such guardian is not authorized to file a bill in his own name to obtain possession of the property of his infant ward, but he must file it in the name .of the infants as their next friend.” (See also 2 Phil, on Ev., 4 Am. Ed., 81; 9 Grat., 273.) A decree in such suit would not protect these defendants from further litigation with the infant. This being a bill for a general account and settlement by the heirs and distributees, all the distributees are necessary parties, (9 Grat., 273; Story Eq. Plead., 89; 2 Munf., 148;) and the application of the strict rule here would require the bill to be' dismissed without prejudice. Courts of equity, however, have in many like clases .remanded the case with directions to permit the infant to be made, a party in a proper manner, the next friend being required to give -the bond under the statute.
When the infant is made-a party, as she is npt now, bound by the proceedings in the Circuit Court, or in this court, she may have a re-investigation of the matters of account and other matters, (8 Ala., 611,) if she so desires.
Again, the allegation in the bill does not, as we think, give Mrs. Sanderson any standing as heir. The allegation is that she is the widow of John P. Sanderson, who died intestate on or about, the 29th-of June, A. D. 1871, leaving her and the said Mary A. S. Sanderson his only heirs surviving.
The- widow has no beneficial interest in her husband's estate other than her dower, as widow, and the statutory allowances.
If she makes election of a child's part instead of dower, within twelve "months after the granting of letters of administration, which the law allows, then she can have a child's part. The claim she makes, however,.is not as heir, but as widow, having a right to elect a child's part in the estate of her-'husband. To make such a case, she should-allege that as widow she has made such election as the law authorizes, and that she claims accordingly.
In this respect We bill may be amended upon remanding the case.
We next examine the question of jurisdiction. It is raised in those'gioxmds of appeal which claim that‘the case should be remanded to the County Court. The bill alleges that there had been no final settlement in the County Court; that no annual settlements had been made; that claims illegal in their character had been paid by the administrator, L'Engle, and the proof discloses that at the time this bill was filed the annual accounts had not been passed by the Judge of Probate. One of the prayers of the bill is for distribution. We cannot see that the simple fact of the filing of the accounts in the Probate Court, no proceeding being .there pending to which the heirs were parties, looking to a final settlement, divests the court of chancery of its well recognized jurisdiction to decree, at the suit of those entitled, a settlement and distribution.
The bill here charges “maladministration” of the estate and failure to make settlements.
The power of the Probate Court in such cases is defined by statute, (Chapter 1733 and 3008, Laws,) and it does not go to the extent of the power of a court of equity which may, at the suit of an heir or distributee, render a final decree against the administrator. The Probate Court may remove the administrator, but it cannot grant the same relief as a court of chancery. An examination of the cases upon the subject, we think, can leave no doubt of the jurisdiction. 5 Mason, 105; 14 Fla., 537; 7 Fla., 45; 5 Fla., 542; 52 Ala., 238; 4 Bibb, 266; 2 Rich. Eq., 147; 52 Ill., 336; 16 N. J. Eq., 236; 12 Cal., 433; Story Eq. Juris., §532, et seq. to §544.
This jurisdiction, however, must be exercised in such manner as to protect the rights of all interested. Our statutes, (Thomp. Dig., sec. 7, p. 207, sec. 5, p. 206,) provides that after all debts and legacies have been paid, the property remaining in the hands of the administrator shall be distributed according to the statute of descents. The statute provides further, that no distribution shall be required of any administrator until the expiration of six months from the taking out of letters of administration, nor shall administrators be compelled to make distribution until bond and security be given by the person entitled to the same to refund a due proportion of any debts or demands which may thereafter appear against the estate, and all costs which may be awarded in the same; provided, that such debt or demand shall appear within two years after granting the letter testamentary or letters of administration. It is contemplated by this statute, and it is in conformity with the spirit of all our legislation, that an administrator shall, upon his qualification, give prompt and due attention to the interests which he represents. That interest is not alone such as ‘the heir, or distributee, or the creditor, or the estate, as distinct from those thus interested, has; it is the interest of all.
In the case of solvent estates, he should pay the debts and wind' up the estate as soon as circumstances and a due regard for all interests will permit. .Investments upon long credits and an employment of the funds in general investments, are no part of his duty. Investments and loans are permitted in order that during the adjustment of the various interests which he represents and the winding up of the estate, he may be held to a just accountability for the use of surplus funds in his hands.
Under these statutes, after the expiration of six months, the law going upon the presumption that he has in the meantime ascertained and paid uncontested and established debts, permits a distributee, upon giving security, to refund his proportion of debts, which “may 'afterward appear against the estate and all costs which pmy he awarded in the same,” to compel distribution.
The letters of administration in this case were granted in November, A. D. 1871. This bill was filed in February, A. D. 1876, over four years after the granting of letters of administration, over thfee years after the limitation to .ac *215 tion against the administrator under the act of 1872 had become operative, and after the statute of non-claim had become operative. It is thus apaprent that the right to distribution under the statute had enured, the distributees giving the bond required in the event that there were outstanding claims against the estate which had been presented and denied, or which were being sued. (4 J. J. Mar., 152; 4 Bibb, 266; 1 Littell, 293.) The statute of Kentucky, under which these decisions were made, is substantially (except that the,time was nine instead of six months) our statute. See 1 Ken. Dig., by Littell & Swigart, 1822, page 532; see also 1 S. & M., 546; 40 Miss., 748.
The practice in such cases is to make the execution of the refunding bond required by the statute a condition precedent to the payment of the ascertained distributive share. 1 Litt., 293; 1 S. & M., 546.
Thus disposing of these questions we consider other grounds for a reversal set up in the petition of appeal.
On the 19th of March, 1877, Joseph H. Durkee was appointed master, to take testimony and report facts. On the 9th of June, A. D. 1877, the defendant L’Engle applied for leave to file a demurrer to the bill, presenting the demurrer proposed to be filed. The court denied leave and this action is the first ground of appeal stated in the petition. The ground set forth in the demurrer is that the bill is multifarious in this, that it is exhibited against this defendant L’Engle, and the other person therein named as defendants thereto for distinct matters and causes, wherein one of these defendants, the said Hartridge, is in no wise interested or concerned; that the defendant, E. M. L’Bngle, is sued as an administrator of the estate of J. P- Sander-son, deceased, and also as surviving partner of the late law firm of Sanderson & L’Engle, and Telief sought against him in,both capacities in the same bill; that .the complainant, in her individual cacapity, cannot call a surviving partner to account as to the business of the partnership.
The application to file a demurrer is made one year after the defendant had filed his answer, and after replication, and order of reference to take testimony, as to matters in issue under the pleadings.
The defendant at this stage of the proceedings and under these circumstances certainly had no right to interpose a demurrer under any known rule of practice. Independent of this, however, the bill is not multifarious. A bill by distributees against administrators for mismanagement and a general accounting, embracing in the demand a debt alleged to be due the estate by one'of the administrators, arising from partnership relations existing between him and the intestate, is not multifarious. Such a debt is an asset to be accounted for, (2 Williams on Executors, 1310, note 1, 6th edition,) and such partner is a proper party in order to take an account of the personal estate, entire. (1 Russ. & Mylne, 277; 1 Ves. Jr., 106; 11 N. J. Eq., 389.) It is unnecessary to discuss the question. The case of a surviving partner, is a special case. The authorities are directly in point and must control.
Subsequently to this action of the court an application of defendant L’Engle to file a cross-bill and supplemental answer was denied. This action of the court is the second ground of appeal. The cross-bill proposed to be filed accompanied this application. The relief sought by this bill is for the appointment of a guardian of tlie estate of the infant, Mary A. S. Sanderson, based upon an allegation that there has not been during the administration, nor is there now, any person having lawful authority to represent the estate of the infant. This is subject matter of defence to the original suit, and not the proper subject for a crossbill. 14 Ga., 167; 20 Ga., 472; 3 Sand. Chy., 273; 34 Ala., 15.
Other relief sought by the cross-bill was a decree against the estate for such an amount as might be found due the administrator from it, upon the accounting and a declee against plaintiff,. M. H. Sanderson, for such sum as might be found to have been paid to her in excess of her .distributive share. To the extent that affirmative relief could be granted the defendant, L’Engle, under a cross-bill in this cause in the matter of the account, he can obtain it by virtue of his rights as an actor in the master’s office upon an accounting there to be had, and if as administrator, he has a right to retain, this right cap be made effective without a cross-bill. Plaintiff and defendant are actors in a bill for an account, and in such cases there is no necessity for a cross-bill-. (Story Equity, §522; 5 Leigh, 561.) So far as the matter of the supplemental answer is concerned, the amendment allowed to be made- to the original answer embraced the allegations proposed to be made by the supplemental answer, and the facts alleged were as available under the amended answer as they would have been under the supplemental answer if it had been allowed.
The third ground of appeal is that the court erred in not dismissing the bill on the ground that the allegations of the bill were denied by the answers, and not sustained by the proofs. The consideration of this ground involves the discussion of the testimony and the merits of the decree appealed from. This decree is objected to and sought to be reversed on ten grounds:
The first is that there was error “ in assuming as a basis for the decree the supplemental answer of E. M. L’Engle, leave to file which had been denied.” (We understand from the briefs that this ground of appeal, being purely technical in its nature, is abandoned.)
The second objection to the decree is that there was error in disallowing the following charges of the defendant, E. M. Engle, viz: the items of $4,600, $5,000, and $5,000, making $14,600, the item of $35,000 and the item of $998,-33, being interest on the $35,000.
We examine the items composing the charge of $14,600. These sums are charged by L’Engle in the account of San-demon, with the firm of Sanderson & L’Engle, to San-derson, as moneys received by him, Sanderson, for professional services as an attorney and counsellor at law, which he did not account for to the firm. An equal partnership in the practice of law is proved to have existed between John P. Sanderson and Edward M. L’Engle from the first of January, A. D. 1869. This partnership was dissolved by the death of Sanderson, on the 29th of June, A. D. 1871. The first question which arises here is, was the sum paid for professional services as attorney at law by either member of the firm during the existence of the partnership ? If this- be the fact, then unless there is some legal objection to the charge, as against the estate, it must stand.
Littlefield swears that the firm of Sanderson & L’Engle were his attorneys, as well as the attorneys in Jacksonville of the Jacksonville, Pensacola and Mobile and the Elorida Central Bailroad Companies; that Sanderson was appointed in 1869 attorney in fact of the J. P. & M. R. R. Co. Littlefield, who was its President, being absent in New York in August, 1869, Sanderson was clothed with full authority to represent his (L’s) interests, and that of the Bailroad Companies mentioned. A copy of this power of attorney is in evidence, which is marked exhibit E, and is as follows:
Know all men by these presents, that the Jacksonville, Pensacola and Mobile Railroad Company, by M. S. Little-field, President, have made, constituted and appointed, and by these presents do make, constitute and appoint John P. Sanderson, of Jacksonville, Elorida, its true and lawful attorney, for said company, and in its name, place and stead, to take charge of, superintend and carry on the construction of its line of road, to be built westward from Quincy, and *216 to make contracts for all kinds of labor, service and material, and right of way, and other things necessary and proper to be used in the construction of the said line of road, and generally to represent said company and if. S. Littlefield, as President thereof, and do and perform every act and thing in the premises as fully as said President could if personally present, necessary to have with full power of substitution and revocation hereby, and confirming all that said attorney shall lawfully do or cause to be done by virtue hereof.
In witness whereof I have hereunto affixed the seal of said company and annexed my official signature this the thirty-first day of August, A. D. 1869.
[seal.] M. S. Littlefield,

President J. P. & M. B. B. Qo.

Signed and delivered in presence of E. M. L’Engle.
This money (.the $14,600) was received by Sanderson from M. S. Littlefield originally not as a fee for professional services.. It was a part of three items, of $5,000 each, paid by Littlefield to Sanderson, in the fall of 1869. As to these sums Littlefield testifies substantially as follows, upon his first examination upon the part of complainant: at the time of the payment of said amounts to Sanderson they were not paid for legal services, but were paid to him as my attorney in fact, for the payment of the engineer corps then engaged in constructing the J. P. & M. R. R. west from Quincy. I was the President of the J. P. & M. R. R. Company. In the spring of 1871 I learned from Sanderson that he had not so expended the money — that he had only paid out to the engineer- corps about $400. It was then agreed that the money should be applied to professional services rendered, and to be rendered, by the firm of San-derson & L’Engle. The agreement to thus apply the money was a verbal agreement, and was made between Sanderson and myself the latter part of April or Hay, 1871.
This witness states also that there was a written agreement between Sanderson and himself, in reference to the railroad companies, dated the 17th of May A. D. 1870. A copy of this agreement is on file, marked “ Exhibit D,” and is as follows:
Exhibit D.
This agreement, made this seventeenth day of May, in the year of our Lord one thousand eight hundred and seventy, by and between Milton S. Littlefield, of Duval county, State of Florida, and John P. Sanderson, of the same place, witnesseth that the said Milton S. Littlefield, in consideration of the covenants on the part of the party of the second part to be performed, doth covenant and agree to and with the said John P. Sanderson, that he will secure the said J. P. Sanderson the position of Vice-President in the -Jacksonville, Pensacola and Mobile Railroad Company* for the time and period of five years, or as President thereof, as the said Littlefield may desire, and paid to said Sanderson the sum of ten thousand dollars per annum for his services in that position.
And the said Littlefield further covenants and agrees to secure said Sanderson the position of President of the Central Railroad Company during the same period unless said company shall sooner be consolidated with the aforementioned coirfpany, in which event said Sanderson shall have the position aforesaid of the whole line of road, from Jacksonville to Mobile. And the said Littlefield futher agrees to retain and employ the firm of Sanderson & L’Engle as the lawyers and attorneys of said Railroad Company, and pay said firm the sum of five thousand dollars per annum for their services, and pay their necessary expenses when attending to the business of the company.
In consideration whereof, the said J. P. Sanderson covenants and agrees to devote his time and service when necessary to the management of said Railroad, and to render all the service usually devolving on said position, and also to render at all. times such aid and assistance as may be reasonably required in attending to the private interests of said Littlefield, and generally to advance the same to the best of my ability, it being understood that all the personal expenses incurred while attending to the business either of the Roads, or of said Littlefield, shall be paid by M. S. Littlefield, and it is further agreed that said Sanderson & L’Engle shall at all times give prompt attention to all the legal business both of said roads and said Littlefield whenever necessary or required.
It is also agreed the said J. P. Sanderson shall have the right to go North or elsewhere for the space of two months in each year if he shall desire so to do. '
It is also agreed and understood that said service and retainer shall commence and date from the first day of Jan-uay, A. D. eighteen hundred and seventy, and that the payments therefor shall be due and payable quarterly.
In witness, we have hereunto set our hands and affixed our seals, this the seventeenth day of May, in the year of our Lord, one thousand eight hundred and seventy.
M. S. Littlefield. [seal.]
J. P. Sanderson, [seal.]
Sealed and delivered in presence of
Rollin Steward,
E. M. Cheney.
The witness Littlefield, states that this contract remained in force up to the 15th day of April, A. D. 1871, and it appears from the testimony of I/Engle that Littlefield gave to the firm of Sanderson & L’Engle, a note for $5,000 under the foregoing contract.
Littlefield states in his testimony that a new agreement was made on the 10th of April, A. D. 1871, but it was not reduced to writing owing to Sanderson’s illness. On this day, the -15th of April, A. D. 1871, Littlefield gave San-derson drafts upon S. W. Hopkins & Co., for $58,133.33. These drafts this witness swears he gave to cover the amount agreed upon at a settlement had between Sander-son and Littlefield on the 4th of June, A. D. 1870, with some interest. The settlement of June 4, 1870, is shown by receipt of Sanderson, marked exhibit D, a copy of which is in evidence, and which is as- follows:
“$57,560.”
“Received of M. S. Littlefield, fifty-seven thousand five hundred and sixty dollars in draft on S. W. Hopkins & Co., 71 Broadway, New York, payable when ,m iunds. When this draft is paid this will be a receipt in full to date for personal service, (amount thirty-five thousand dollars,) also for seventy shares of the stock of the Florida Central Railroad Company standing in the books of the company in the name of my wife, and interest to date, and the full balance due Messrs. Call, Baker and Niblack, for their interest in the Tallahassee Railroad, sold by me as attorney in fact to said Littlefield, but the item for personal service does not include the legal services of the firm of Sanderson & L’Engle, or for any service rendered under written contract with the said Littlefild.
“J. P. Sanderson.”
Littlefield, as to this receipt and settlement, and as to the sum,of $15,000, testifies further, that in April, 1871, when he gave the drafts mentioned to Sanderson, the sums of money he had paid him in 1869 were spoken of, and it was agreed that he would render to me an account of the moneys he had received from me, as well as the moneys he had received from the companies. But he was not to refund any moneys. He was to apply them to the payment of the salaries of Sanderson & L’Engle, under the new contract to commence the 15th day of April, A. D. 1871, for professional services thereafter to be rendered.
On the 16th February, A. D. 1872, in a contract between *217 I/Engle and Littlefield, Littlefield covenanted not to make any claim for any moneys he had paid Sanderson, and Lit-tlefield swears that this covenant referred to this sum of $15,000.
There is in the record a copy of a memorandum of an agreement to be made between the Florida Central Railroad Company and the J. P. & M. R. R. Co., of the first part, and John P. Sanderson and Edward M. L’Engle comprising the firm of Sanderson & L’Engle of the second part. This memorandum recites that the parties of the first part do retain and employ the parties of the second part and each of them as the counsellors and attorneys at law of the parties of the first part, for and during the term of three years commencing on the 15th of April, 1871, at a salarj' of $20,000 per annum, the firm of Sanderson & L’Engle to render prompt and faithful services as attorneys and coun-sellors at law.
The testimony of the witness establishes the fact that, this contract existed until the death of Sanderson.
We think-it is apparent from this testimony that no such sum of fifteen thousand dolías was due the firm of San-derson & L’Engle by Littlefield or the Railroad Companies after the settlement of April 15th, 1871, and it may have been true that Littlefield or the interests whi$h he represented might have recovered the excess beyond the amount due under the contracts, but Littlefield has yielded any and all daifa to recover such sums by his agreement of the 16th February, A. L. 1872. This contract upon its face enures to the benefit of the firm of Sanderson & L’Engle to the estate of Sanderson, and to the surviving partner, L’Engle. The language is plain and beyond doubt. The money was paid to Sanderson for professional services. That is clear.
■We do not see how L’Engle, his partner, can- be denied his share of the money, upon the ground that it was more than could have been collected of Littlefield or the interests which he represented. As to the contract of February 16th, 1872, there is nothing in it to prevent L’Engle’s recovering his share of this money paid Sanderson for professional services. Whether Littlefield thought it was due or not, he paid it on that account, and Sanderson must account to his partner L’Engle for it. This sum having been paid to Sanderson on account of professional services, upon what principle can L’Engle be denied the right to his equal share of it unless it be on the ground that his claim as against the estate is barred by the statute of limitations, or the claim for some other reason good in law should not be enforced against the estate.
Such objections are made, but as the same objections apply to other items their consideration is postponed.
The next item which was disallowed by the court, and which appellant insists should have been permitted to stand as a charge against Sanderson, in his account with the firm of Sanderson & L’Engle, is the sum of $35,000, which appellant insists was received by Sanderson for professional services. The basis of this claim is the receipt of Sander-son for $57,560, (see exhibit E, heretofore inserted in this opinion,) and the testimony of Milton S. Littlefield'.
Littlefield, as to this receipt, testifies, that on the 4th of June, A. L. 1870, he settled with J. P. Sanderson and gave an order upon S. W. Hopkins & Co., for $57,560. This order was not paid, and on the 15th day of April, A. D. 18-71, he gave new drafts upon S. W. Hopkins & Co. for the amount of $58,133.33, and that these drafts were to cover the amounts agreed upon at the settlement on the 4th of June, 1870, and interest upon a portion of the account added.
This receipt states that it was given, first, in full to date for “personal service,” $35,000.
Second. For seventy shares of stock of the Florida Central Railroad Company.
Third. For balance due Messrs. Call, Baker and Niblack for their interest in the Tallahassee Railroad Company.
Sanderson, in this receipt, then states: “But the item for personal service does not include the legal service of the ’firm of Sanderson and L’Engle, or for any service rendered under written contract with said Littlefield.”
By reference to exhibit D., (contract between Littlefield and Sanderson in former part of this opinion,) it will be seen that the firm of Sanderson and L’Engle were at the date of this settlement and had been since the 17th day of Mal, A. D. 1870/under a written contract with Littlefield to render service as attorneys at law at a salary of $5,000 per annum, and Littlefield, as we -have before seen, swears that $14,600 dollars was paid on account of professional services rendered and to be rendered.
From this exhibit, viewed in reference to and construed with the other written evidence, it is apparent that whatever else the term “personal service” here used may indicate, it does not mean services as an attorney and counsel] Cv at law. áanderson, in the receipt given for the $35,000 for personal service, states expressly that “the item for personal-service does not include the legal savices of Sanderson and & Engle?’ In addition to this, he says that it does not include service rendered under written contract with Little-field, and at the time this receipt was given Sanderson and L’Engle were under written contract to render their services as attorney at law for the sum of five thousand dollars per. annum. Littlefield accepted this receipt from Sanderson. Littlefield wrote it at Sanderson’s dictation. He certainly must be held to have known its contents, and he is the only witness that knew anything of it at the time. But it is said that Littlefield’s testimony is positive to the effect that Sanderson rendered “no other service for him than as attorney and counsellor at law,” and it is true that Littlefield so testifies in general language. We cannot, however, as against this receipt, which is consistent with the other written evidence, accept this or the other general declara- * tions of Littlefield based upon his idea of what are the duties of an attorney at law retained by him. Again, exhibit E. and Littlefield’s testimony show that Sanderson, as at- . torney in fact, did do service other than as an attqrney at law. As attorney in fact he represented the J., P. $; Ml Railroad Company, and its President, under the agreement of the thirty-first of August, A. L. 1869, (see exhibit E. in previous part of this opinion,), and services, such as the active management of a railroad and the extension of a line of railroad, are not such services as would follow a retainer as an attorney and counsellor at law. Littlefield, upon his cross examination, states that if he employed an attorney at law to look after his interests in a railroad corporation, he should expect him to do evenjamdall things when he was absent as well as when he was present, and if it was necessary to protect my (his) interests for the attorney to act as my attorney in fact, I should expect him to do it. This power of attorney (exhibit E.) bears date the 31st August, 1869. Littlefield says that during the years 1869 arid 1870 he was absent from the State two-thirds of the time, and perhaps more; that Sanderson frequently advised him by letter upon the general condition of matters here, including the road; that he (Sanderson) frequently called for iron and material to extend the road, and that his (San-derson’s)'principal object was to get a line of steamers from Jacksonville to New York. It is apparent from what this witness states that he misconceives the duty of an attorney and counsellor at law. "VVe think'the testimony shows that Sanderson did perform service in addition to his employment as an attorney at law, and that the receipt upon its face sustains the view that the $35,000 was not paid him *218 for service as a member of the firm of Sanderson & L’Engle; at any rate, the rule is unquestionably that the burden of proof here is upon the defendant, L’Engle. He must establish his debt by legal evidence when it is denied, (6 Paige, 168,) and we certainly cannot say that the debt has been established by this evidence. We cannot say under the proofs that L’Engle has established a right to any portion of this sum. The defendant and appellant, failing to establish any right to the principal sum, he has no right to interest thereon, and the claim for $908.30 cannot be allowed.
Before stating the method of accounting in a case of this character, or deciding other questions raised, we will, as we are now treating of the subject of charges in the accounts, discuss the matter of account arising upon the cross appeal. We examine first the charges connected with the partnership of Sanderson & L’Engle. It is insisted by the complainant upon her appeal that the item of $1,200 charged Sanderson and allowed by the court was improper. The evidence shows that this was a charge for moneys received from the sale of the stock in the Tallahassee Railroad Company, which stock was owned by Messrs. Call, Baker and Niblack. We must hold that a sale or sales of stock in a • railroad company do not belong to the business of attorneys and counsellors at law, and that the charge must be disallowed in the absence of proof of an express contract making such sales a part 'of the business .of the firm as attorneys; or that such acts were embraced in the ordinary usages and customs of this business in the locality where it was carried on; or that this transaction was one which the firm was employed to effect; or that the ordinary exigencies and objects of the partnership embraced sales of stock. (Story on Part., 102, .126.) The purchase or sale of stock owned by another person and for another person, charging a commission for such sale or purchase, is the recognized business of a broker. Such- a class was recognized in Eng.land so early as the reign of Queen Elizabeth, (Baker’s Chron., 411, Tom. Law Die. title Broker,) and they are recognized by the laws of the United States, (13 Stat., 252, 472,) and of the State of Florida, (Chap. 3099, Sec. 11, Laws.) Under the acts of Congress a broker is defined by the Supreme Court of the United States as “one whose business it is to negotiate purchases or sales ol! stock, exchange, bullion, coined money, bank notes, promissory notes, or other securities, for himself or others.” There is an implied warranty that what a broker sells is what he represents ii to be, and-should this stock here have turned out to be a forgery,- Sanderson could have been held responsible; while L’Engle, we think, could not, because it was an act outside of and beyond Sanderaon’s business as an, attorney at law. This concludes the items of account objected to as allowed or disallowed upon the appeal* and cross-appeal, 30 far as the accounting arises out of the partnership accounts of Sander-son & L’Engle. The items of $35,000 and of $1,200 being, as we think, under the evidence not proper charges against Sanderson in the partnership accounts, it is unnecessary to say more of them. As to the other items of $14,600 charged to Sanderson in the firm accounts as moneys received in his relation as a partner in the firm of Sanderson •& L’Engle, it is contended:
First: That it is barred by the statute of non-claim and the statute of limitation
Second. That it is a stale claim which a court of equity ought not to enforce.
If we understand the proposition of the respondent as to the statute of non-claim, it is to the effect that an administrator, with the estate in his hands for the purpose of administration, must present to himself or to the Probate Court, his claim against the estate within the time limited, or it will be barred like the claim of 'any other creditor. The proposition, that an administrator must prove his debt when he claims to retain out of the assets is correct, but the proposition that he must necessarily present and prove his claim within two years, if the exigencies of the estate require his possession 'of the assets beyond that time, we cannot sanction. Under our statutes, except in insolvent estates, there is a right to retain. If a debt exists, we think his right to payment at least co-extensive with his right to retain, and this exists as a general rule so long as he has assets in his hands. It is a right incident to the possession of assets, as we understand' it. This is the disinction between himself and other creditors, and his right to retain results from the fact that “it were absurd and incongruous that he should sue himself, or that the same hand should at once pay and receive the same debt.” 6 Fla., 29; Williams on Ex., 6 Am. ed., 1040, 1050, and cases cited; 53 N. H., 531 ; 8 Bush., 564; 24 Vt., 402.
As to the operation of the statute of limitations. The right of action to recover any of this money did not accrue until Sanderson received it and held it under the agreement to expend it for professional services. We do not propose to decide when it did accrue, but it certainly did not exist before that time. This agreement was made in the spring of 1871, and Sanderson died in June, 1871, and L’En-gle was appointed administrator in November, 1871. The claim, therefore, was not barred’ at Sanderson’s death, or when the administrator was appointed. Not being barred at that time, the administrator had a right to retain its amount from the assets in his hands, as neither the statute of non-claim nor the statute of limitations contemplate that he could sue himself, or require a presentation of a demand due himself to himself, or a filing of the account in the Probate Court. This case does not involve the question whether an administrator can retain for a debt barred by the operation of the statute during the lifetime of the intestate, or at the time he was appointed. The extent to which we go is to say that if not so barred at either of these dates, the statute of limitations will not operate to bar it by adding to the time which elapsed before his appointment the time which expired before a final settlement of the estate is had.
It is held by the Supreme Court of Alabama in the case of the Distributees of Knight vs. Godbolt, Administrator, 7 Ala., 304, that “an administrator, when cited to a final settlement by a distribuee, is entitled to show a retainer of assets for any just debt due to himself, although within the bar of the statute of limitations, so that it is without the period of time when the presumption of payment would arise.” The Supreme Court of Maryland says: ‘“So long as the creditor is administrator, the statute of limitations can have no effect upon the demand; such cases are exceptions to the rule that when the act begins to run against a claim, nothing arrests its operation.” 10 Maryland, 243. The statute of limitations does not run in some cases when the right of action is suspended. 11 S. and M., 10; 12 Wheat., 134; 4 Hax. and John., 393; 1 Har. and John., 337; 5 Bar. and Aid., 204. Here the executor could not sue himself. His right was other than that of an ordinary creditor to sue the legal representative of the intestate, or to exhibit his claim to him. His right was to retain without suit or presentation, and, upon final settlement, to have his claim satisfied, if a presumption of payment does not operate against him.
'It is held that the statute stops running in his favor if he owes the estate, (3 Cranch, C. C., 371,) andi it should stop running in favor of the estate if it owes him. It is insisted further that a court of equity should not allow this claim on account of laches and the doctrine of stale claim arising from unexplained acquiescence.
The fair conclusion from the proof here is that L’Engle did not know of the existence of this sum as an asset of *219 the partnership until after the commencement of this suit. His failure to demand it before is fully explained. This disposes of all matters of account arising in this case out of the partnership of Sanderson & L’Engle, and the rights of L’Engle, the administrator, arising out of his relation as a creditor of the intestate.
We proceed next to examine the objections to other items of the* account of the administrator allowed by the court, and which are before us on the cross appeal of the complainant. The plaintiff objects in her cross appeal to the allowance by the court of five items of the administration account.
The two grounds upon which this objection is based in the petition of appeal are that “it is not shown that they were presented within two years from the publication of notice to debtors and creditors, and that at the time they were paid they were barred by the statute of limitations.” To these grounds the complainants restricted themselves in their original briefs- in the cause filed on the 14th of January, A. D. 1880.
An additional ground is urged against the action of the court by complainants in an additional brief filed on the 27th January, A. D. 1880. This ground is that the debts were not proved. No application to amend the petition of appeal in the cross appeal was made. These grounds are suggested in an additional brief and no where else. There is nothing in the record of the action of the Circuit Court which discloses such an objection. On the contrary, this objection might have been urged ¿gainst a majority, if not all of the claims embraced in the accounts of the administrator filed in this cause.
The appellant in the cross appeal, plaintiff in the Circuit Court, not only did not make any objection to these items, (excepting the Baxter debt,) upon the grounds urged in the supplemental brief, but in the Circuit Court treated all claims embraced in these accounts as being admitted, so far as this objection is concerned. Had this objection been made there the administrator might have obviated it.
The rule of this court in such cases is to restrict the party to his petition of appeal. While it is within the power of this court “to consider points made here for the first time, if Taised by the pleadings and proofs, yet care must be taken that neither party be permitted to surprise or mislead his adversary, or to make objections which, if made in the court below, might have been obviated.” 4 Fla., 359; 18 John., 558.
This objection made.here, so far as we can see, for the first time, is of that character. It is not urged in the petition of appeal and we will.not under these circumstances consider it.
As ta these accounts, (with the exception of the Baxter claim) we deem it unnecessary to enter into any discussion of the items in detail.
As the case must be remanded with directions to state an account, it is only necessary to announce the principles of law which-we think control the subject. It is settled in this State that' an administrator has no authority to bind the estate of'tlfe intestate by a promise to pay a debt barred by the statute of limitations before the death of the intestate. 4 Fla., 488.
All such-charges, if any shell there be in these accounts, will therefore be rejected. "When the statute has not run in the life time of the intestate, and the cause of action survives, then it ceases to-rim after his death until an administrator is appointed; and; upon his appointment, the action under the statute must be brought “within one year after the. issuing of letters of administration.” Sec. 15, Chap. 1889, Laws.
The terms “after the expiration of that time” in this section are limited by the terms ^within one year after issuing letters of administration.” The terms “after the expiration of that time” in this section arc there to make it clear that even if a greater length of time than the general limitations has expired after the death of the intestate, and before letters of administration are issued, yet, in cases where the limitation has not operated in the life time of the intestate, the time between his death and the issuing of letters shall not be estimated. The letters in ibis case were issued November 7, 1871. The time limited for an action under the 15th section of the act against this administrator, therefore, was the 7th November, 1*872. An action brought against this administrator is not an action “heretdfore barrel! by statute, or that will be barred within sixty days from February 27th, 1872,” within the meaning of the 19th section of this act, and hence this action is at once affected by the limitations of the act of February 27th, 1872, as all actions not excepted by the 19th section are. under its terms, affected by its limitations. If, however, during this period of twelve months there has been a presentation of the claim to the administrator, we think it takes it out of the statute. Upon the qualification of the administrator he is, with reference to causes of action of this character, controlled by two statutes — the statute of non-claim and this statute of February 27th, 1872. It has been the practice in this State since its organization to -require of a creditor nothing more than a presentation or exhibition of his claim to the administrator. This stopped the operation of the statute of limitation and of non-claim. It has never been held in this State that the creditor after presentation must reduce his debt to judgment. As remarked by the Supreme Court of Mississippi, “the accumulation of unnecessary costs and the sacrifice of the interests of heirs would be the natural result of such a policy.” (40 Miss., 716.) Such is the. doctrine of the Supreme Court of Wisconsin. 29 Wis., 64.
It is true the opposite rule prevails in some of the States, ■but this view is in conformity with our practice, and we think, looking to all the interests involved, that it is the correct rule. By “exhibition” or presentation is meant “such notice to the executor or administrator of the existence of the debt or demand, its character and amount, as would enable him, with reasonable certainty, to provide its payment.” 3 Fla., 106.
In speaking of a like clause in a statute in New York, Mr. Justice Bronson, for the Supreme Court of that State, says: “There is nothing in the statute which necessarily requires a personal interview between the claimant and the executor, nor that the evidences of the debt should be laid before the executor unless he requires it. Where the executor already understands the whole matter, and does not desire that the evidence should be submitted to his examination, it cannot*be necessary for the creditor to do more than to present his claim; and that may be done through an agent, by a written communication, or in any other way which deals fairly with the executor and the interests which he represents. If thq presentation is made by letter, the exfecutor is bound to deal ingenuously with the creditor. If he wishes to see the evidences of the debt, or to have the oath of the creditor to the justice of the claim, he should say so, and not leave the claimant to suppose he has done everything that is wished and afterwards object that there bus not been a> formal presentation of the demand.” In addition to this it may be remarked that the administrator does not represent the heir -as against the creditor. He is under no obligation to the heir to resort to any artifice to benefit the heir at the expense of the creditor. Indeed, if there is any difference it is in the creditor’s favor,‘'as his claim must be satisfied' first
In addition to what I have already said as to the statute of limitations, I will remark that the general rule seems to *220 be that an administrator is not bound to plead the general statute oí limitations in bar of an action to recover a debt otherwise justly due. 13 Mass., 164; 40 Miss., 711; 13 Mass., 162; 23 Pen. State, 95; 9 Maryland, 317; 2 Kent’s Com., 416, note c; 3 Met., 369; 8 Bush., 564; 4 Har., 368; 10 Maryland, 262; 5 Jones’ Eq., 168; 3 Ind. Eg., 442; 10 Humph., 301; 11 Leigh, 1; 28 Ala., 484; 49 Miss., 48; 8 How., (U. S.) 402, 411.
The dictum in 9 Darling & Eyland, alluded to by the Supreme Court of the United' States in the case in 8 Howard, was disapproved in 4 Kay. & J., 166. As a matter of course, this rule of law cannot operate in this State to revive a debt barred in the lifetime of the intestate, because this court as we have stated has decided otherwise, nor do I think that this rule can operate as to the limitation fixed in the 15th section of the act of 1872, (chapter 1869, laws,) because while the section is embraced in the general statute of limitations, it is still a statute which limits the time when an action can be brought against an administrator in his representative- capacity md as administrator.
I can fiiid no exception to the rule that in such case the administrator must plead the statute, (13 Mass., 162; 11 N. H., 208; 39 N. H., 428; 4 Allen, 359; 5 Pick., 140; 16 Ill., 318; 48 N. H., 25; 9 Mo., 262,) and hence in my opinion he must be charged with all such claims as he has paid, and which were not presented within twelve months after his letters issued.
The majority of the court think the limiiation of a year does not operate in case where, anterior to the passage of ' the act of 1872, the administrator has given notice requiring the exhibition of claims. I cannot see how the notice given by the administrator deprives the legislative department of the government' ox the power to fix a shorter and reasonable time, (in this case from two years to eight months,) for the presentation of the claim.
I cannot see that the notice is in any sense a contract, or that any obligation of a contract arises from it. I think it a mere statutory provision, based upon no consideration between the creditor and the administrator, and like any other statute giving directions in the matter of the winding up of the estate, -is subject to modification by the legislature. I have not given to this question that thought and examination which its importance demands, as the view of the majority of the court is to be the law of the case, whatever may be my conclusion. .1 will, however, say that the 15th section of this act, considered with reference to ’estates upon which letters of administration had been granted before its passage, as well as the provisions of the 19th section, any sensible construction of which makes the act have a retroactive operation, are eminently illiberal and unjust to creditors.
In addition to the objections arising under the statute of limitations mentioned in the petition of appeal, as applicable to the other claims to the allowance of which objection is made, the item of $453.55, paid by William A. McLean, attorney for the Baxter estate, is objected to on the ground that there is no evidence that it was a just demand against the estate. There appears in the testimony a receipt of William A. McLean, as attorney at law of the Baxter estate. The circumstances surrounding the claim and its payment, as appears from the testimony, are substantially as follows:
Judge McLean testifies: . “My connection with this matter as attorney, (commencad during the lifetime of Sanderson, with E. M. L’Engle the law partner of Sanderson, and by direction of Sanderson. There were some items that we could not settle at that time, and as I did not have the data ’ and tirn Baxter heirs were absent^ some in New York, and some in New Jersey, I corresponded with them but failed to complete the settlement before Sanderson’s death; after his death Thomas W. Bell, husband of one of the Baxter heirs, dame to Jacksonville with powers of attorney from all the heirs giving him full power to represent them. The settlement with L’Bngle, administrator, was made by Bell, Fleming and Daniel, I think, representing L’Engle. I having been counsel in the case before the death of Sanderson, and at that time still representing the Baxter heirs in other matters, I/Engle preferred that I sign the receipt which I did in order that the settlement might be made. Not one dollar of the money represented by this receipt did I receive for services, my fee having been paid to me before Sanderson’s death.” The testimony was called out upon the cross-examination of this witness by complainant.
L’Engle testifies that the testimony of Judge McLean, as to this claim, is substantially correct. In the transactions between Judge McLean and himself before the death of Sanderson, he represented Sanderson simply as a friend. The settlement at that time was incomplete. S. D. McConnell, then a clerk in the office of Sanderson & L’Engle, did the principal part of the work in the settlement. The money had been collected by Sanderson in his professional capacity out of business placed in his hands before our partnership. Sanderson had never accounted to his clients, and was deficient in memoranda by which to make an account. Sanderson was very ill and could not give it personal attention. After liis death, when called upon by Mr. Bell, I (L’Engle) requested Fleming & Daniel to examine into the matter and advise me what to do. I told them that it being a demand against Sanderson, as an attorney, for trust funds, that it was desirable a settlement should be made, if possible, without suit, for the protection of Sanderson’s memory and character. Fleming & Daniel, in writing, advised me (L’Engle) to pay what I did. This written advice is filed. That Sanderson admitted the indebtedness to the Baxters. It was his credits that he could not recollect. He admitted a large indebtedness. Sanderson had received for Martha B. Baxter as her attorney at law money from Hoeg, from Charles Wiley, John S. Samis and A. M. Feed, the whole amounting to more than $4,000. This was the money about which the partial settlement above stated was made between McLean, representing the Baxter interest, and myself as Sanderson’s friend, before the latter’s death, concerning which I took the advice of Fleming & Daniel. Sanderson’s business with Mrs. Baxter was very much confused and involved. He could' not state the account, and the amount of the indebtedness was unascertained when he died. This witness, being asked to state at what time and in what amounts the money was received by Sanderson, answers that money was paid by Sanderson at the time of the partial settlement between McLean and himself. He says I do not recollect the time at which it was paid, but probably through himself, stating that he might probably ascertain by reference to the checks drawn and the memoranda upon them. Upon subsequent cross-examination, the witness having at a former date been asked to produce any check or order- or other evidence of the payment of money on account of the Baxter claim received by him from Sanderson, said I have not ascertained what payments were made by John P. Sanderson in his lifetime on account of the Baxter claim. I have no means of getting that information. I have ascertained the amount I received from him to be applied to that claim. I received $802.64, which was paid as an approximation from the data then at hand of- the amount due by Sanderson. Of this amount $454.12 was in accounting with Baxter’s attorney, McLean, applied to an indebtedness of Martha B. Baxter, held by Sanderson and L’Engle, and $348.52 were paid to McLean as such attorney. The funds were received by me from Sanderson May 25th, 1871, and *221 the application was made May 31st, 1871. I received the funds by check of Sanderson on D. G-. Ambler. The check was drawn payable to me or bearer and contained in parenthesis the words, “Baxter accounts,” in my handwriting. The entire check was filled up by me. Samuel D. McConnell, for defendant, swears that Sanderson kept his accounts in a very loose manner; that he, McConnell, was temporarily engaged in the office of Sanderson & L’Engle in 1871; that a short time before Sanderson was disabled from attending to business, he asked me to assist him in making out a statement for a settlement between himself and the representatives of the estate of Baxter, which involved a considerable amount of money. He and I worked at it altogether for several hours, he relying upon his memory as to the -various transactions connected with it. "We had a great deal of difficulty in adjusting the account, and finally did so by approximation. That was a professional matter of liis own, and not of the firm of Sanderson & L’Engle. I mean by the approximate statement of the Baxter account that it was impossible to make up an accurate statement, such as could have been made from books properly kept, but that the balance was arrived at approximately from his recollection. The representatives of the Baxter estate were not present. I only assisted Sanderson in making up a statement in order that he might be prepared for a settlement. The statement of the account was made in writing. It was made in the office, and I had nothing more to do with it after I made it. I do not know where it is. My recollection is that the difficulty was in fixing dates and exact amounts of money paid to Sanderson so as to fix the commission and interest account. I only remember that the moneys came into Sanderson’s hands through professional transactions bet\yeen him and the estate. This witness says that during the latter part of Sanderson’s life his memory failed him. The receipt for the amount ot this claim signed “W. A. McLean, attorney for Baxter estate,” recites that it is upon a “full settlement of the indebtedness of the estate of Sanderson to the estate of Martha B. Baxter, after rectifying errors ih account heretofore stated,” is dated December 28, 1872, and appears in the record. There is also in the record a paper signed Thomas W. Bell, attorney in fact, purporting to be executed by virtue of a power of attorney from “the executors of the estate of M. B. Baxter,” which ratifies and confirms the receipt of McLean as a “full settlement of all claims of M. B. Baxter against the estate of John P. Sanderson.” There is also in thfe record a paper signed by Fleming & Daniel stating that they “have examined the accounts and vouchers in the matter of a contradicted balance between the estate' of John P. Sanderson and the estate of M. B. Baxter, and, after satisfying ourselves in regard to the facts, axe of the opinion that the sum of four hundred and fifty-three and fifty-five one hundred dóllars is due by the estate of Sanderson to. the estate of Baxter. This amount we advise to be paid to "William A. McLean, Judge of the County Court for Duval county, on his receipt ratified and endorsed by Thomas W. Bell, as attorney in fact, for the executors of the estate of M. B. Baxter.” It appears from' this testimony that the claim of the heirs of M. B. Baxter against the estate of Sanderson was for moneys which San-derson, as attorney at law, had collected during his life time, and for which there was a partial settlement made before his death. Sanderson did not keep books in which he made accurate, cotemporaneous entries of his business. During the latter part of his life, and when his memory was impaired by sickness, he, with the assistance of a bookkeeper (McConnell), made a statement of the account from memory and some memoranda in the absence of any representative of the estate. A partial settlement was had and a payment through L’Engle of the sum of $802.64 wag made on the 25th May, A. D. 1871.
The statement of account made by Sanderson and McConnell was in writing, but is not evidence. McConnell says he does not know where it is. Sanderson at the time was unwell and unable to attend to general business. After Sanderson’s death a settlement was made by L’Engle with the parties interested in the Baxter estate through their attorney in fact, Thomas W. Bell, Fleming & Daniel representing L’Engle. Fleming & Daniel, after examining the accounts and vouchers in the matter, advised the payment of $453.55 in settlement of the account, and the payment was made. L’Engle testifies that Sanderson had received as attorney at law of M. B. Baxter over $4,000.
This testimony establishes that something was due in addition to the payment of $862.64, but it does not establish that the amount paid was due. The only testimony that proposes to show the amount that was at any time due the estate by Sanderson, is that of L’Engle, and the payment stated upon Sanderson’s approximate statement.
It certainly cannot be a fair conclusion from this testimony, that any such sum as $4,000 was due at the date of the partial and approximate settlement in view of the fact that only $862.64 was paid then, and in view of the further fact that the amount paid in full settlement thereafter was the sum of $453.55, making a total of only $1,256.19. L’Engle’s testimony is too indefinite as to the date when the $4,000 was due for us to base any conclusion upon it. It is not consistent with the balance of this testimony, unless, which we think was the case, L’Engle alluded to all of the sums collected by Sanderson as attorney for this party during this* employment. His testimony amounts to nothing more than that Sanderson received $4,000 as attorney at law, but what part of it was due at Sanderson’s death, the subject of enquiry here, is not shown. The only evidence here that the sum of $453.55 was due is its payment. The letter of Fleming & Daniel, stating that they find such a sum to be due, is hearsay. It is the indebtedness to be established, and this does not do it. The letter is no more than the statement of an individual. The settlement of this claim as shown by exhibit Y, was not approved by the Probate Court until the order of .Tune J, 1876. This suit was pending before that time, and independent of any question as to the disqualification of the Probate Judge in the matter of passing this order, we are satisfied that the rule of law is that an order of this character, made by the Probate Court while this suit was pending in a court of chancery, does not give to the account approved any additional force or validity. The master in chancery in such an event should reject all items not established by competent testimony. 1 Brock., 500; 5 Mon., 577; 2 Phillips on Ev., 4 Am. ed., C. & H. notes, page SI, note 289.
Thus disposing of these particular items of account and the question of statute of limitations, we reach the general question of accounting. An accurate examination of the eases in this State up to 1857, (5 Fla., 564; 4 Fla., 112,) and of the statute, (Thomp. Dig., 207, sec. 9, No. 2,) regulating the investment of moneys in the hands of an administrator will show, that both the decisions and the statute regulating the nature of securities for moneys, loaned by them, relate to the money of minors in the hands of administrators. So far as adult heirs are concerned, the statute I think makes no provision and prescribes no restriction as to the nature of the securities upon which administrators may loan money of the estate in their bands, in which such adult heirs have no interest. As to their general duty in this respect the statutes (Thomp. Dig., page 207, sec. 9, and chap. 1013, laws,) require that they shall make their annual returns at any time before the first day of June, in each *222 year, and' their liability is the general liability 'of an administrator in a court of equity in reference to funds in his hands. This is my view; but this court in Moore & Monford vs. Felkel, et ux. 7 Fla., 44, held that the statute was applicable to adult heirs or distributees, and after the lapse of twenty-three years with no legislation upon the subject, we should follow that decision. That case involved this point and this precise question was there raised and decided. 7 Term Rep., 242; Show. Par. cases, 154; 1 Kent Com., 476; 16 John., 402; 1 Yerg., 376; 5 New York, 389; Cool. Con. Lim., 52.
In the case of Moore & Montford vs. Hamilton, 4 Fla., 119, this court remarked that the statute not only restricted "the power of executors to mortgage security, but as a further protection of the interests of minors, very properly annexes to the exercise of that power the sanction and approval of .the Court of Probate.” The investments made by L’Engle without the approval of the Judge of the Probate Court are such as the complainants here may accept or reject. A court of equity will not compel them to take any security but that which the law required the administrator to take; and, in the case of unauthorized investments, the heirs are not limited to the rejection of all or none of them, but may accept such as they choose and reject the others. 40 N. Y., 91.
As to the unauthorized securities accepted or to be accepted, the acceptance, as a matter of course, ends the question as to them. As to the securities rejected, there are two remedies which the distributees may have. First, Under the general principles of equity they are entitled to receive all such sums of principal and interest as were at any time actually paid to the administrator upon such rejected securities. This is true because such principal is the money of the estate, and such interest is the result of the use of the money of the estate in which the distributees have such right. Such sums received, the administrator will be charged with in his general yearly account, and they will enter into his yearly balances. From the time, however, that such interest ceases to be paid upon the security, in the event the distributee, at her option, chooses to take actual principal and interest paid, the administrator will be charged nothing more than simple interest. In other words, the administrator will not be charged with compound interest upon sums not received by him. As I understand the decisions of this court in the case of Moore and Montford vs. Felkel and wife, 7 Fla. 68, compound interest was not there charged upon the uncollected note of Craig & Lockerman.
Without entering into discussion of the subject, we will say that there is nothing in this case which should induce a court of equity to direct such charge by way of penalty, and I know of no rule of law. to otherwise authorize it.
The other remedy or right of the distributees is such as the statute, under the decision in the case of Moore and Montford, executors, vs. Felkel and wife, gives them. Under that rule the distributees may reject the unauthorized investment, and the administrator may be charged with the amount invested in the security in his accounts, with annual rests and interest thereon to be calculated as authorized by that decision.
As to the general accounting. Interest at the rate of 8 per cent, will be charged, the interest upon the balance found at the beginning of a year to be carried into the balance struck at its close, computing interest for the next year upon the whole; no interest being computed upon the sums when received. Young’s Admr. vs. McKinnie’s Admr., 3 Fla., 557.
If any sum is found due by L’Engle to the estate on account of his relation as partner in the firm of Sanderson & L’Engle, it will bear simple interest at the rate of 8 per cent. Tliis is not the case of an ascertained debt due by the administrator. The debt here, if any exists, involves an accounting to ascertain it, and arises from a partnership relation. L’Engle cannot compound interest on his claim against the estate, and the estate certainly should not compound interest on L’Engle’s debt to it.
Wherever either heir or distributee puts the administrator to proof of a voucher, regular and proper on its face, the payment of which is sworn to by the administrator such heir or distributee, in the event the claim is established, should be charged with'all costs attending such proof.
One other question remains and that is, whether the administrator, E. M. L’Engle, is a competent witness; and, if so, to what extent?
• The testimony of L’Engle, so far as it recites any transaction or communication between himself and the intestate, is objected to upon the ground that it is not admissible under the provisions of section 1, chapter 1983, laws. Under the act in force (chapter 1816) anterior to this statute, it was provided that there should be no exclusion of any witness in a civil action because he was a party or interested in the issue to be tried.
Chapter 1983 does not in terms repeal this act. Chapter 1983 provides that no person offered as a witness in any court, or before any officer, acting judicially, shall be excluded by reason of liis interest in the event of the action or proceeding, or because he is a party thereto. It is thus apparent that this portion of the section did not change essentially the existing law. Following this general clause is a proviso: “That no party to such action or proceeding, nor any person interested in the event thereof, nor any person from, through or under whom any such party or interested person derives any interest or title by assignment or otherwise, shall be examined as a witness in regard to any transaction or communication between such witness and the person at the time of such .examination, deceased, insane or lunatic, against the executor, administrator, heir at law, next of kin, assignee, legatee, devisee, or survivor of such deceased person, or the assignee or committee of such insane person or lunatic.”
The effect of this proviso or as it is called in the act “prohibition,” was to restrict the general competency as witnesses of parties and interested persons, or persons through whom parties and interested persons claimed, to transactions or communications other than those with a person deceased, insane or lunatic, when the action was against the executor, administrator, heir at law of such deceased person, or the other parties named. The act, however, further provides “that this prohibition” (meaning the proviso just stated) “shall not extend to any transaction or communication as to which any such executor, administrator, heir at law, next of kin” and other parties above named, “shall be examined on his own behalf, or as to which the testimony of such deceased person err lunatic, shall be given in evidence.” Und?’* the provisions of this last clause the prohibition is restricted in its operation, and is made inapplicable to cases where the administrator shall be examined in his own behalf as to any transaction of the deceased. In other words, the statute contemplates that the administrator may voluntarily become a witness as to a transaction of the deceased in a suit against him, the administrator as the representative of the deceased, and when he makes himself such witness, the adverse party or any person interested, or any person through whom the adverse party or interested person claims, may be examined as to such transaction or communication. If this power of the administrator to become a voluntary witness exists in all cases, and as to all transactions, then all of the testimony of L’Engle in this case is admissible. We do not think, however, that an administrator is a competent witness un *223 der this statute to establish his own individual debt against the estate. While technically and as a matter of form he is the representative of the estate in this suit, still when he goes into the master’s office to establish his debt against the estate he becomes an actor against the heirs and distributees in his personal capacity as distinct from his representative car paciiy. He occupies there strictly the relation of a creditor, seeking to establish his personal debt against the estate, and like any other creditor, he is not competent to speak to any transaction or communication of the deceased as to his own claim unless the heirs or distributees seek voluntarily an examination on their own behalf as to such transaction, in which event, like any other creditor of the estate when sued by the heir, he becomes a competent witness to such transaction or communication.
When, however, the justness of a claim of a creditor, other than himself, which he has paid, is denied by the heir of distributee, then the administrator may testify as to transactions and communications with the deceased in reference to this claim of the creditor which he has paid. This last case is, we think, within the letter, as well as within the spirit of the statute, when it allows the administrator to testify. When, therefore, in this case L’Engle testifies as to transactions and communications with the deceased as to his own claim against the intestate, his testimony is, we think, inadmissible, except as to matters to which the plaintiff, the heirs, are examined on their own behalf. As to these he is competent. He is a competent witness as against the heir, when he testifies as to transactions or communications of the deceased in reference to the claim of a third party, a creditor, other than himself, which he has paid. If the creditor had sued him directly he would have been a competent witness. The letter of the statute permits him so to be, and we see nothing to ‘justify us in holding that this case, like that of his own claim, is intended to be embraced in the prohibition. As to his own claim, he stands as an individual seeking payment at the hands of the estate. As to the claim of the other creditor, he neither had nor has any other relation to it but that of administrator, and the statute, in express words, permits an examination % on his own behalf in such case.
This statute is taken from the Hew York Code (sec. 399.) We have examined all the decisions of the courts of Hew York which we have, and find nothing against this conclusion.
The decree is reversed, and the case will oe remanded, with directions to the Circuit Court to permit the minor to be made a party, to permit the widow to amend the bill by making such allegations as will show that she has elected a child’s part, and for further proceedings consistent with this opinion and conformable to law.
Tub Chief Justice
delivered the following supplemental opinion:
I agree with the conclusion deduced from the opinion prepared by Mr. Justice Westcott, that it is clearly within the province of the Legislature to abridge the statutory period of limitation as to causes of action already accrued at the time of the passage of the act so affecting the limitation; provided, the act gives a reasonable time after its passage within which actions may be commenced. The statute of non-claim gave creditors two years from the issuing of letters testamentary or of administration in which to present their claims. The 15th section of the act of limitations of 1872 requires actions to be commenced against executors and administrators within one year from the issuing of letters. While this is regarded as a valid statute, in so far as it may abridge the period of the statute of non-claim to one year, yet, in cases where letters had been issued and notice to creditors that claims must be presented within two years had been duly given, as required by the statute of non-claim, before the taking effect of the act of 1.872, the latter act (section 15) does not apply so as to cut off the right of creditors to present their claims within the two years allowed by such notice.
While the statute of limitations is not a contract, and does not control its terms so as to prevent a reasonable change of the time for presenting claims or commencing suits, the notice to creditors by the administrator or executor under the statute in existence at the time notice is given may be considered as in the nature of an agreement between the estate and the creditors as to time for presenting claims, which cannot be changed by a legislative act to the disadvantage of creditors.
Van Valkenburgh, J., concurs in this conclusion.